UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
JILYNN EAGEN, EDWARD EAGEN, INDIVIDUALLY, AND AS NATURAL PARENTS AND REPRESENTATIVES OF MINOR CHILD, E.E.

                                *Plaintiffs,*        No.: _____

*-against -*

TOWN OF WHEATFIELD, a municipality located in Niagara County, New York, Individually and as Successor in Interest to NIAGARA SANITATION COMPANY; CROWN BEVERAGE PACKAGING, LLC individually and as Successor in Interest to CONTINENTAL CAN; AND GREIF, INC. individually and as Successor in Interest to GREIF BROS. COOPERAGE CORPORATION; REPUBLIC SERVICES, INC. individually and as Successor in Interest to NIAGARA SANITATION COMPANY, INC.; THE CARBORUNDUM COMPANY; INDUSTRIAL HOLDINGS CORPORATION individually and as Successor in Interest to THE CARBORUNDUM COMPANY

                                *Defendants.*

-----------------------------------------------------------------------X

COMPLAINT

## <u>COMPLAINT</u>

Plaintiffs JILYNN EAGEN, EDWARD EAGEN, INDIVIDUALLY, AND AS NATURAL PARENTS AND REPRESENTATIVES OF MINOR CHILD, E.E., by and through their attorneys, NAPOLI SHKOLNIK PLLC, STAG LIUZZA, LLC, and CHRISTEN E.. CIVILETTO, Esq., for their complaint against Defendants the TOWN OF WHEATFIELD individually and as Successor in Interest to NIAGARA SANITATION COMPANY, CROWN BEVERAGE PACKAGING, LLC individually and as Successor in Interest to CONTINENTAL CAN, AND GREIF, INC. individually and as Successor in Interest to GREIF BROS. COOPERAGE CORPORATION, REPUBLIC SERVICES, INC., individually and as Successor in Interest to NIAGARA SANITATION COMPANY, INC., THE CARBORUNDUM

COMPANY; and INDUSTRIAL HOLDINGS CORPORATION individually and as Successor in Interest to THE CARBORUNDUM COMPANY ("Defendants"), state and allege the following upon information and belief, except as to the allegations that are alleged upon personal knowledge, and, *inter alia*, the investigation made by and through their attorneys. Plaintiffs, by and through their attorneys as and for their Complaint, hereby state and allege:

## NATURE OF ACTION

1.     This Complaint states claims pursuant to 42 U.S.C. § 1983 and the United States Constitution, and state law claims for negligence, strict liability, and trespass. It seeks relief in the form of compensation for personal injury, property damage, declaratory relief, medical monitoring, as well as punitive damages, exclusive of interest, costs, and attorneys' fees.

2.     This Complaint is related to consolidated litigation comprising *Andres, et al. v. Town of Wheatfiled*, *et al*., 1:18-cv-00560-CCR,  *Bellafaire, et al. v. Town of Wheatfield, et al.*, 1:18-cv-00560-CCR, and *Wirth, et al. v, Town of Wheatfield*, *et al.*, 1:18-cv-01486-CCR ("Related Litigation").

3.     Defendant, TOWN OF WHEATFIELD, individually and as Successor in Interest to NIAGARA SANITATION COMPANY ("WHEATFIELD"), is a municipality subject to the authority of New York statutes and law, located in Niagara County, in the State of New York.

4.     THE CARBORUNDUM COMPANY was, at all material times material to the allegations herein, a foreign business corporation registered to do business in the State of New York. On information and belief, it owned and/or operated various industrial plants that sent toxic and hazardous wastes to the Nash Road Landfill.[1]

---

[1] Documents related to the activities of Carborundum Company are attached hereto as Exhibit A-1.

5.      CROWN BEVERAGE PACKAGING, LLC individually and as Successor in Interest to CONTINENTAL CAN ("CONTINENTAL"), is headquartered at 1 Crown Way, Philadelphia, Pennsylvania, 19154-4599.  CONTINENTAL CAN was incorporated in New York in 1913.  At all times material to the allegations herein, CONTINENTAL CAN was doing business in the State of New York.

6.      GREIF, INC individually and as Successor in Interest to GREIF BROS. COOPERAGE CORPORATION ("GREIF"), is headquartered at 425 Winter Road, Delaware, Ohio, 43015.   GREIF BROS. COOPERAGE CORPORATION had a plant in Niagara Falls, Canada.     At all times material to the allegations herein, GREIF BROS. COOPERAGE CORPORATION was doing business in the State of New York.

7.      INDUSTRIAL HOLDINGS CORPORATION individually and as Successor in Interest to THE CARBORUNDUM COMPANY is headquartered at 277 Park Avenue, 46th Floor, New York, New York 10172. At all material times, THE CARBORUNDUM COMPANY was doing business in the State of New York.[2]

8.      REPUBLIC SERVICES, INC. individually and as Successor in Interest to NIAGARA SANITATION COMPANY, INC. is headquartered at 18500 North Allied Way, Phoenix, Arizona, 85054.   REPUBLIC SERVICES, INC. is a foreign business corporation registered to do business in New York. At all times material to the allegations herein, NIAGARA SANITATION COMPANY, INC. was doing business in the State of New York.

---

[2] The NYS Department of State, Division of Corporations documents on Industrial Holdings Corporation is attached hereto as Exhibit A-2; Additionally, Responses to Interrogatories and Requests for Production from Industrial Holdings Corporation disclosing corporate successorship to Carboundum Company are attached hereto as Exhibit A-3.

## JURISDICTION

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions; 28 U.S.C. §1343(a)(3) and (4), which authorizes federal courts to hear civil rights cases; and 28 U.S.C. § 2201, the Declaratory Judgment Act and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

10.      This Court has jurisdiction over the subject matter of the Counts I and II pursuant to 42 U.S.C. § 1983; the Declaratory Judgment Act, 28 U.S.C. § 2201; and federal question jurisdiction, 28 U.S.C. § 1331.

11.      This Court has supplemental jurisdiction over Counts III, IV, and V under 28 U.S.C. § 1367 because the state law negligence, strict liability and trespass claims are so related to the federal claims in this action that they form the same case and controversy under Article III of the United States Constitution.

12.      This Court has personal jurisdiction over the Defendants since each of them, for the events and happenings referred to herein, were doing business in New York and/or owned property in New York, or had its chemical waste transported to the Nash Road Landfill, such that it is reasonably foreseeable that they would be subject to the jurisdiction of the courts of this state.

13.      Pursuant to New York General Municipal Law, timely notices of claim for all three Plaintiffs was made upon the municipal defendant, Town of Wheatfield, at least thirty days have elapsed since the service of such notices, which was February 25, 2022, adjustment or payment thereof has been neglected or refused, and this action was commenced within one year and ninety days after the happening of the events upon which the claims are based. N.Y. Gen. Mun. Law § 50-i (McKinney).

## VENUE

14.     This case is properly venued in this Court because the actions of the Defendants or their predecessors, and the injuries and damages alleged herein, all occurred in the County of Niagara, New York.

15.     Venue is proper in the Western District of New York pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C § 1391(b) because the actual and threatened endangerments, releases, injuries, failures to warn, and damages at issue are taking place and have taken place in this district.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

16.     This is an action brought by and on behalf of Plaintiffs arising out of the prior and continuing release, discharge, and deposit of toxic and hazardous substances and contaminants onto Plaintiffs' property and persons, including but not limited to Aldrin, Arsenic, Barium, BHC (Benzene Hexachloride), Benzo-trichlorides (also known as trichloromethylbenzene or TMB), Benzene, Caustics, Chlordane, Chlorobenzenes, Chromium, OC Pesticides, DDT, DDE, and DDD, Dieldrin, Dioxin, Endrin (Endrin Aldehyde), Hexachlorocyclohexane, Lindane (gamma-BHC), Lead, Mercury, Petroleum products (including hexane, benzene, toluene, xylenes, naphthalene, and fluorine), Plating tank sludge, Phenol, PAHs or Polycyclic aromatic hydrocarbons, polychlorinated biphenyls or PCBs and Love Canal wastes identified herein.

17.     At the time of exposure and resulting injuries complained of herein, Plaintiffs were former occupants and/or current owners of 1134 Niagara Falls Boulevard, located in Niagara County (the "Property"), which is located near the real property and facilities of approximately twenty-five (25) acres on 7415 Nash Road Wheatfield, NY, situated immediately north of the City of North Tonawanda city limits and east of Nash Road; it was known as the Nash Road Landfill ("the Site" or "the Landfill").

18.     The Site was operated by the Niagara Sanitation Company between 1955 and 1968 for the disposal of municipal and industrial wastes.  It was and is currently owned by the Town of Wheatfield.  After a rainfall and during wet months, the Site accumulates water that flows onto adjacent private property and into the sewer system. This was a fact that has been known by the Town of Wheatfield and Niagara Sanitation for years.

19.     The Site is a closed, unlined, uncapped dumpsite, or landfill, that had been used by the Niagara Falls Air Force Base, Bell Aerospace, the Carborundum Corporation/Carborundum Company, Frontier Chemical, Graphite Specialties, Continental Can, and Greif Brothers, as well as local municipalities to dispose of municipal, industrial and hazardous waste including metals, polycyclic aromatic hydrocarbons, polychlorinated biphenyls, pesticides, caustics, and plating tank sludge.

20.     Further, Hooker Chemicals & Plastics Corp. was identified as the source for the Love Canal waste at the Site. It became Occidental Chemical Corporation in 1982. Throughout this lawsuit, Occidental Chemical will be used to refer to both Hooker Chemicals & Plastics Corp. and Occidental.

21.     All of the above entities were identified by the New York State Department of Environmental Conservation (NYSDEC) as potentially responsible parties, and asked, to enter into a Consent Order to implement and finance a remedial program for Site.

22.     Records from the NYSDEC, including, but not limited to, the Interagency Task Force on Hazardous Wastes Memorandum from 1978[3] and the 1979 Draft Report on Hazardous Waste Disposal in Erie and Niagara Counties, New York[4] describe the waste materials generated by each of the above entities and their disposal at the Site.

---

[3] Attached as Exhibit A-5
[4] Attached as Exhibit A-6

6

23.     In the 1979 report, the NYSDEC noted that Niagara Falls Air Force Base, Bell Aerospace, the Carborundum Corporation, Frontier Chemical, Graphite Specialties, Continental Can, and Greif Brothers disposed of "caustic, plating sludge, and other industrial waste."

24.     The 1979 report also notes "protruding refuse still apparent" at the Landfill at the time of the report.

25.     The 1979 report further notes "area subject to flooding" as a condition of the Landfill site.

26.     Additionally, NYSDEC records indicate that Bell Aerospace disposed of plating sludge, caustic solids, and fly ash at the Site. The report also notes that Carborundum disposed of wastes at the Site from its Sanborn Plant. Wastes from this plant included scrap paper, wood, graphite (including 30 percent coal tar pitch) carbon and garbage. Other Carborundum owned or operated plants also contributed wastes to the Site.

27.     Occidental Chemical Corporation entered into an Order on Consent and Administrative Settlement for the Site after being identified as a responsible Party by the NYSDEC.[5]   As part of the Order, it agreed to take remedial action, including excavating toxic waste from the Love Canal dumpsite, which had been deposited at the Site in 1968 with the knowledge and sanction of Hooker Chemical.

28.     Following the partial removal of the Love Canal material from the Site, Occidental, through its contractor and subsidiary Glenn Springs Holdings, Inc., provided confirmatory testing results that demonstrated that Love Canal waste was still present at the Site.[6]

29.     From 1964 through 1968, Niagara Sanitation and the Town of Wheatfield received numerous complaints and concerns from neighbors and the Niagara County Department of Health.

---

[5] Attached hereto as Exhibit A-7.
[6] Appendix K, Confirmatory Sampling, attached to IRM Closure Report, attached as Exhibit A-8.

These concerns included the proximity of the landfill to homes, the lack of fencing around the landfill where children were known to play daily, the lack of proper grading and cover, and the health concerns of living in such close proximity to the landfill operations.

30.     On May 24, 1965, Eugene F. Seebald, P.E., Assistant Commissioner for Environmental Health wrote to, among others, Town of Wheatfield officials and Niagara Sanitation Services. Mr. Seebald explained that the landfill was "frequented by scores of children" which "makes this very undesirable for disposal of garbage at this site."

31.     On June 10, 1965, North Tonawanda resident Mrs. James Stonebraker of 16 Forbes Terrace wrote Eugene Seebald of the Niagara County Health Department. Mrs. Stonebreaker alleged that the dump has not been properly covering its waste and that **youngsters go into the dump daily.** She closed by saying, "A residential area should not have to be near such a serious health and safety hazard. I urge you to demand that this Town of Wheatfield dump be closed down immediately."

32.     On September 14, 1965, another Health Complaint against the Nash Roads landfill was sent to Angelo Zino of Niagara Sanitation. "Repeated inspections of this site have revealed that dumping of refuse has not been confined to an area which can be effectively maintained and operated in accordance with [New York Regulations]." The letter goes on to say that the refuse has not been compacted and covered daily with at least 6 inches of suitable material and no fencing has been installed.

33.     On April 4, 1966, Eugene Seebald wrote the Town of Wheatfield Board and Mr. Winston F. Moeller to inform them that a recent inspection has yielded numerous deficiencies. Among the issues with the landfill's operation are: (1) The lack of cover earth over previously deposited putrescible material on the easterly area of the site sufficient to prevent public health nuisance; (2) The area where the previous deposited putrescible material exists **has not been**

**graded to prevent leaching of nuisance producing drainage to the surface**; (3) Where putrescible material has previously been deposited in existing open water areas, sufficient non putrescible fill has not been used to cover so as to prevent the existence of a public health nuisance. Steps required by the department to bring the site into compliance are also enumerated including an order to grade the property in an acceptable way.

34.    Despite these concerns and complaints, Niagara Sanitation and the Town of Wheatfield continued to accept waste until 1968. These known issues and the later acceptance of highly toxic and hazardous materials demonstrates a reckless disregard for the health and safety and property of landfill neighbors.

35.    In addition to the toxic chemicals dumped by Defendants at the Site, approximately 1,600 cubic yards of Love Canal waste material from Hooker/Occidental, which had been excavated from the Love Canal dumpsite (later a Superfund Site) was dumped at the Site in Wheatfield in a trench that was **"excavated into the underlying clay."**[7]

36.    Shortly thereafter waste disposal activities at the Site ended and the nature of the hazardous waste within was not disclosed to the surrounding neighbors. Defendants never advised or warned anyone in the neighborhood that these wastes migrate and were extremely hazardous to people and animals.

37.    On September 4, 1968, W.M. Friedman sent correspondence to Wheatfield Supervisor Brzezinski requesting that he contact Mr. Webster from the Niagara County Solid Waste Agency. The goal of that communication was to set in motion the closure of the Nash Road site, which would include proper final grading and covering of the dump.

---

[7] 2019 DEC Report, p.3, attached as Exhibit A-9.

38.     On October 3, 1968, W.M. Friedman sent Wheatfield Supervisor Stanley Brzezinski a letter informing him that the disposal of domestic waste was being completed in an area in close proximity to the "chemical waste recently buried here." Friedman warned Brzezinski to cease the disposal of these domestic refuses so near the chemical waste, due to the fact that the necessary burying of the former could pose a danger. The Assistant Commissioner also implores Brzezinski to take additional steps to keep heavy machinery away from the area of the buried chemicals. According to Friedman, the proximity posed the danger of the chemicals being exposed to the atmosphere.

39.     The Site, which in appearance is an area of woods or forest, is located directly adjacent to homes.  The Site is unimproved and appears to be unused and, during all times relevant to this action, contained no fence or signage limiting access.

40.     The Site was used recreationally by area residents – including Plaintiffs – for decades.  Activities undertaken by nearby residents and Plaintiffs include, but are not limited to, walking, bike riding, riding of all-terrain vehicles, motorized dirt bikes, fishing, hunting, trapping and dog-walking.

41.     On May 24, 1965, Eugene F. Seebald, P.E., Assistant Commissioner for Environmental Health wrote to, among others, Town of Wheatfield officials and Niagara Sanitation Services. Mr. Seebald explained that the landfill was **"frequented by scores of children"** which "makes this very undesirable for disposal of garbage at this site."

42.     The use of bikes and motorized vehicles created airborne migration material from the Site during dry conditions.  During wet conditions or when there was standing water at the Site, material was carried off-site as "mud" on shoes, vehicles and pets. Children and adults present on the open site were exposed to Defendants' toxic and hazardous waste without any warning.

43.     In 1981, the Niagara County Department of Health conducted an investigation and concluded that "[t]he potential for migration of chemicals off-site is present." Noting the proximity of the homes on Forbes Road, the Department of Health recommended that the town of Wheatfield conduct an abatement and required that the landfill be properly closed.  This was not done.

44.     A 1988 EPA Site Inspection Report stated that hazardous waste excavated from the Love Canal dumpsite was disposed of at the Site in a trench of soft, layered clay and that no engineered barriers were installed.   The excavated materials were placed into a trench at the northeast end of the Site that was excavated into underlying clay and then covered with soil. Water samples taken at the Site revealed benzene at 4500 mg/L, chlorobenze at 590 mg/L, toluene at 14,000 mg/L, and acetone at 2,300 mg/L.  Samples of Lead in the landfill ranged from 67 to 20,000 ppb.

45.     The 1988 EPA Site Inspection Report indicated that the Site was flat and drainage was poor, and prior to the dumping, the Site was a swamp.  It also indicated that 1) groundwater was contaminated and that the population would be potentially affected; 2) that surface water and soils were "rusty" in appearance and methylene chloride, total organic halogens and toluene were detected, 3) that soil samples contained metal and organic contamination; 4) that it had been observed that the Site was used by local residents as a play area and that some local residents were believed to draw water from the contaminated aquifer; and 5) that pools of orange tinted standing water were observed and rubbish was protruding out of the ground.

46.     A Phase II Investigation was performed in 1989 for the Division of Hazardous Waste Remediation at the New York State Department of Environmental Conservation ("DEC"). Its recommendations indicated that the shallow groundwater at the site contained significant contamination of toxic organic compounds and metals and that there was a potential for the contaminants to migrate off the site.  It stated that additional work should be performed to

determine the potential for off-site migration and whether or not it was presently occurring, including a soil vapor survey of adjacent homes and analysis of off-site wells, and that the Site should be capped and a fence constructed to limit public access to the site.  Work conducted up to the date of the report had not included a determination of whether the disposal trenches dug for the Love Canal waste had breached the clay layer exposing the regional aquifer underneath the Site; the Report, therefore, recommended an investigation to make this determination.

47.     Despite the above delineated reporting, no action was taken and none of the recommendations were performed.  The Site remained just as it was. The adjacent community was not informed of any findings, directives or reporting. Thus the community was not warned of the danger to persons and property, and therefore continued to use the unfenced Site for recreational activities.

48.     In 1992, upon information and belief, Mr. Dennis Mills of 1394 Forbes Road, North Tonawanda, New York 14120, complained that his sump pump and a ditch in his yard contained concerning materials.

49.     The NYSDOH agreed to test the sump pump and ditch.

50.     In a letter dated March 3, 1993, NYSDOH advised Mr. Mills that his sump pump contained inorganic and metal constitutents, but that "[a]ll of the inorganic or rnetal constituents were at levels normally found in Western New York."

51.     NYSDOH further advised Mr. Mills that his soil contained organic chemicals.

52.     NYSDOH found "methylene chloride (dichloromethane)" and "bis(2-ethylhexyl)phthalate," two Love-Canal associated chemicals, but dismissed those as likely "laboratory contamination."

53.     NYSDOH found phenanthrene, a PAH and highly toxic chemical, but its presence was dismissed since it is allegedly "commonly found" in the environment as a result of fires or car

engines. It also found 4,4'-DDE, 4,4'-DDD, and 4,4'-DDT, pesticides associated with Love Canal, which NYSDOH attributed to likely "past use of these compounds." Aroclor 1248, a PCB, was also found. NYSDOH attributed the presence of that PCB to "electric transmission lines," even though there is no nearby transformer (and even though different Aroclors are potentially used in electric transmission lines), the only part of electric transmission lines that might contain small amounts of PCBs. Finally, benzoic acid was found, which is directly associated with Love Canal, but its presence was dismissed as "naturally occur[ring] in the environment."

54.     NYSDOH copied various government officials on the March 3, 1993 letter, including NYSDEC and Niagara County Health Department, and a Mr. Wakeman.

55.     Despite these findings, and despite the multiple action items recommended in 1989, no remedial or protective work occurred at the site for nearly twenty-five years, nor were residents warned by anyone that they were being exposed to toxic chemicals that had already been determined to be migrating across the Site.

56.     An emergency "call out" relating to the Site was issued by the NYSDEC at the end of 2013. A revised call-out issued by NYSDEC was issued on March 24, 2014.

57.     Groundwater and Environmental Services, Inc. ("GES") conducted a Supplemental Site Characterization and reported its findings on November 12, 2013 (GES, 2013). The report again confirmed the presence of migrating chemicals, including NAPL (" NAPL was observed at SB-H from 4 to 12 ftbg"), Metals (cadmium, silver and mercury), pesticides (benzenehexachloride (BHC) compounds (including lindane) and aldrin that were detected at several orders of magnitude above residential limits), VOCs (benzene, toluene, and chlorinated benzenes), and SVOCs (primarily various PAHs). (GES 2013, pp. 8-9)

58.     GES issued Supplemental Site Characterizations or Recommendations on March 27, 2014, May 2014 (GES, 2014) and July 1, 2014 (GES, 2014). In the July 1, 2014 report,

concentrations of numerous toxic substances were noted in soil boring samples, including, but not limited to, exceedances of metals (barium, cadmium, total chromium, and mercury and more, TCLP Metals,  Pesticides (primarily Dieldrin), SVOCs (primarily various PAHs), and PCBs. (GES 2014, p. 6) Similarly, groundwater results revealed exceedances of Pesticides, VOCs,  and SVOCs (primarily phenolic compounds).

59.     In August 2014, Conestoga Rovers prepared an Interim Remedial Measure Work Plan report for Glenn Springs Glenn Springs Holdings, Inc., a subsidiary of Hooker/Occidental. The report notes: "The Site investigations indicated the presence of a dark non-aqueous phase liquid (NAPL) as well as contaminated soil and groundwater in the area where the industrial wastes were placed. Several of the chemicals identified during the investigations appear to be consistent with chemicals that are present in the industrial waste contained in the Love Canal landfill."

60.     In 2014 and 2015, Hooker/Occidental's subsidiary, Glenn Springs Holdings, excavated 80 dumptruck loads of Love Canal waste from the North East corner of the Site.

61.     On December 21, 2015, the New York Department of Environmental Conservation ("DEC") issued a Public Notice pursuant to the State Superfund Program: "Inactive Hazardous Waste Disposal Site Classification Notice", which stated in part:

> As of the date of this notice, the site identified above, and located on a map on the reverse side of this page, was reclassified on the Registry as a Class 2 site that presents a significant threat to public health and/or the environment for the following reason(s): The site is a former municipal and industrial landfill that accepted waste from multiple sites, including Niagara Falls Air Force Base, Bell Aerospace, Carborundum, Frontier Chemical, Graphite Specialties, Continental Can, and Grief Brothers. Site contaminants include metals, polycyclic aromatic hydrocarbons, polychlorinated biphenyls, pesticides, caustics, and plating tank sludge. The landfill does not have a Part 360 cap or access restrictions. Both conditions indicate a concern for potential exposures to people who enter the site. This exposure concern has been documented as people are using the landfill as a jogging and play area. Dirt bike trails are evident throughout the site and use of such has resulted in landfill

materials to become exposed at the surface. Therefore, the site represents a significant threat to the environment and public health. If you own property adjacent to this site and are renting or leasing your property to someone else, please share this information with them.

62.     Glenn Springs Holdings prepared a report in 2016 that stated: "The Site investigations indicated the presence of a dark non-aqueous phase liquid (NAPL) as well as contaminated soil and groundwater in the area where the Frontier Avenue construction project [Occidental/Hooker's Love Canal waste] wastes were placed. Several of the chemicals identified during the investigations appear to be consistent with chemicals that are present in the industrial waste contained in the Love Canal landfill." (Glenn Springs 2016, p. 12)

63.     For decades, Defendant Town of Wheatfield was fully aware that the Site contained an unknown quantity of toxic chemicals, toxic contaminants and waste, industrial solvents and sludge, and banned pesticides, including but not limited to Aldrin, Arsenic, Barium, BHC (Benzene Hexachloride), Benzo-trichlorides, Benzene, Caustics, Chlordane, Chlorobenzenes, Chromium, OC Pesticides, DDT, DDE, and DDD, Dieldrin, Dioxin, Endrin (Endrin Aldehyde), Hexachlorocyclohexane, Lindane (gamma- BHC), Lead, Mercury, Petroleum products (including hexane, benzene, toluene, xylenes, naphthalene, and fluorine), Plating tank sludge, Phenol, PAHs or Polycyclic aromatic hydrocarbons, polychlorinated biphenyls  or PCBs and Love Canal wastes identified herein.  Despite having knowledge of the hazardous nature of the chemicals at the Site, and despite being directed by environmental and health authorities to address site access and exposure, Defendant Town of Wheatfield left the Site abandoned for decades, without proper cleanup, oversight, or management, with no signage as to the danger, no fencing of the property to prevent access, and without engineering controls to prevent seepage and transport of contamination on to the surrounding properties, including Plaintiffs' Property.

64.     In 2017, The NYSDEC issued a fact sheet about the Niagara Sanitation Landfill as it relates to the State Superfund Program. It stated that the Site was reclassified as a Class 2 Site "due to recently identified elevated surface soil contaminants in several locations and the presence of hazardous waste in the subsurface on the site."

### Love Canal[8]

65.     Love Canal is one of the most, if not the most, notorious and infamous hazardous waste sites in the United States.

66.     From 1942 to approximately 1953, Hooker Chemicals & Plastic Corp. (now Occidental Chemical Company) used Love Canal as a landfill, disposing of an estimated 21,000 tons of chemicals and hazardous waste.

67.     Shortly thereafter, Hooker ceased use of the property and sold it to Niagara Falls School board for $1.00 seeking to absolve itself of future liability. An elementary school was built on the former landfill site and hundreds of families took up residence in the surrounding area.

68.     Community residents first began reporting odors and residues at the Love Canal site in the 1960s. In the 1970s, groundwater contaminated with more than 80 industrial chemicals – including heavy metals, pesticides, and dioxin – had migrated through sewers and creeks and began seeping into people's properties, including Plaintiffs' Property.

69.     According to the New York State Department of Health in an April 1981 Special Report to the Governor and Legislature: "In some houses directly adjoining the landfill an oily coating was discovered in basement sump pits; there also was evidence of underground chemical infiltration through cinderblock foundations in some first-ring homes."[9]

---

[8] Attached as Exhibit A-10, 1978 Special Report to the Governor and Legislature; attached as Exhibit A-11, 1981 Special Report to the Governor and Legislature.

[9] Vapor intrusion and groundwater seepage is commonly accepted as two pathways for the offsite contamination near Love Canal. Plaintiffs in this case have alleged the same methods of transport or pathways.

70.    Several presidential emergency declarations were issued and approximately 950 families were evacuated from a 10 square-block area surrounding the Love Canal landfill.

71.    "Love Canal Waste" now includes more than 100 chemicals identified in soil, sump and air samples at the Love Canal which are capable of causing acute and chronic toxic reactions in man. The wastes brought from Love Canal to the Niagara Sanitation Landfill includes these same chemicals. For example, long-term exposure to benzene has been shown to cause leukemia and suppress bone marrow function; when ingested in sufficient quantity, lindane can cause convulsions; chloroform and carbon tetrachloride can cause liver damage; and dioxin -- one of the most toxic chemicals known to man -- has been linked to cancer and birth malformations in laboratory animals.

72.    In a September 1978 Special Report to the Governor and Legislature, the New York State Department of Health noted highlighted a number of chemicals found at Love Canal (the same waste that was brought to the Landfill in the present case) and their health effects:

Following is a list of some of the more important chemicals identified at the Love Canal site and the human biologic hazards associated with them.

| COMPOUND | ACUTE EFFECTS | CHRONIC EFFECTS |
|---|---|---|
| benzene | Narcosis<br>Skin irritant | Acute leukemia<br>Aplastic anemia<br>Pancytopenia<br>Chronic lymphatic<br>  leukemia<br>Lymphomas (probable) |
| toluene | Narcosis (more powerful<br>  than benzene) | Anemia (possible)<br>Leukopenia (possible) |
| benzoic acid | Skin irritant | |
| lindane | Convulsions<br>High white cell counts | |
| trichloroethylene | Central nervous<br>  depression<br>Skin irritant<br>Liver damage | Paralysis of fingers<br>Respiratory and cardiac<br>  arrest<br>Visual defects<br>Deafness |
| dibromoethane | Skin irritant | |
| benzaldehydes | Allergen | |
| methylene chloride | Anesthesia (increased<br>  carboxy hemoglobin) | Respiratory distress<br>Death |
| carbon tetrachloride | Narcosis<br>Hepatitis<br>Renal damage | Liver tumors (possible) |
| chloroform | Central nervous narcosis<br>Skin irritant<br>Respiratory irritant<br>Gastrointestinal symptoms | |

## The Contaminants

73.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

74.    Contaminants at the Landfill have been identified by the State of New York through sampling and testing, a review of historic documents, and knowledge of contaminants that were present at Love Canal and later moved to the Landfill. Additionally, contaminants have been

identified at properties belonging to Plaintiffs in Related Litigation, and throughout the community near the Landfill by testing and sampling performed on behalf of individual Plaintiffs and the putative class as a whole in Related Litigation.

75.     Aldrin is an extremely hazardous (pursuant to 42 U.S.C. 11002) organochlorine insecticide that was derived from hexachlorocyclopentadiene, a persistent organic pollutant.  It does not occur naturally in the environment. Aldrin was banned in the US in the 1970s because of concerns about damage to the environment and human health. According to the Agency for Toxic Substances and Disease Registry (ATSDR), people who have ingested large amounts of aldrin have suffered convulsions and death. Health effects have occurred after a longer period of exposure to smaller amounts because aldrin builds up in the body. Workers exposed to moderate levels of Aldrin over a longer time have suffered from headaches, dizziness, irritability, vomiting, and uncontrolled muscle movements. Additionally, studies have linked exposure to Aldrin and other organochlorine pesticides to systemic autoimmune diseases such as Rheumatoid Arthritis and Lupus. Animal studies have found that exposure to aldrin affects the nervous system, liver, and ability to fight infections. The ATSDR notes that humans can be exposed to aldrin through air, surface water, or soil near waste sites.

76.     Arsenic is identified by the World Health Organization (WHO), the Department of Health and Human Services (DHHS), and Environmental Protection Agency (EPA) as a human carcinogen. In the past, some arsenic compounds were predominantly used as pesticides. Additionally, arsenic has been used as a preservative for wood to make it resistant to rotting and decay. Small quantities of elemental arsenic are added to other metals to form metal mixtures or alloys with improved properties.  Arsenic cannot be destroyed in the environment. It can only change its form, or become attached to or separated from particles. It may change its form by reacting with oxygen or other molecules present in air, water, or soil, or by the action of bacteria

that live in soil or sediment. Arsenic can get into groundwater by dissolving in rain or snow or through the discharge of industrial wastes.

77.     Exposure to even low levels of Arsenic is known to lead to adverse human health effects. Acute health effects include vomiting, abdominal pain and diarrhea, numbness and tingling of the extremities, neuropathy, and muscle cramping. Long term effects of arsenic exposure include skin pigmentation changes, skin lesions, and hard patches on the palms or soles of the feet. Other adverse health effects associated with long term exposure to arsenic include developmental effects, diabetes, pulmonary disease, and cardiovascular disease.  Arsenic is a known human carcinogen and increases the risk of lung, skin, bladder, liver, kidney and prostate cancers.

78.     Barium is a metal that can be found in the environment, but has a variety of uses including, but not limited to, as getters in electronic tubes, rodenticide, and colorant in paints.

79.     Small amounts of water-soluble barium can cause hypokalemia (decreased blood potassium), cardiovascular and muscular effects, breathing difficulties, increased/decreased blood pressure (hypertension and hypotension), heart rhythm changes, stomach irritation, gastrointestinal/biliary effects, muscle weakness, paralysis, changes in nerve reflexes, swelling of brains and liver, kidney and heart damage.

80.     BHC (Benzene Hexachloride) is a synthetic chemical that exists in multiple chemical forms (including alpha BHC, beta BHC, delta BHC, and gamma BHC which were found in both Landfill samples and Plaintiff property samples). Although technical-grade BHC is no longer used as an insecticide in the United States, many BHCs have been found in the soil and surface water at hazardous waste sites because they persist in the environment. In air, the different forms of BHC can be present as a vapor or attached to small particles such as soil and dust. BHC can remain in the air for long periods and travel great distances depending on the environmental conditions.

81.     BHC can cause blood disorders, dizziness, headaches, and changes in sex hormones in the blood. Acute exposure to high levels of BHC can impact the nervous system and cause hyperexcitability, seizures, and convulsion. Inhalation of BHC can cause increased liver enzymes. Exposure to BHC and other organochlorine pesticides has been linked to systemic autoimmune diseases such as Rheumatoid Arthritis and Lupus. The EPA has classified alpha BHC as a probable human carcinogen.

82.     Sampling and test results by Plaintiffs surrounding the Site in Related Litigation in 2017 and 2019[10] demonstrate levels of BHC many orders of magnitude higher than the background/control samples obtained several miles away. Some examples are included below:

The table below shows the maximum OC-pesticide and PCB concentrations for controls (n=5) vs. target samples (n=96). Data are in ug/kg.

| Target address | Analyte | Targets max. | Controls (5) |
|---|---|---|---|
| 1597 Ruie | a-BHC | 140 | 20** |
| 1484 Forbes | g-BHC* | 33,000 | 8.9** |
| 19 Forbes Terr. | b-BHC* | 160 | ND |
| 1597 Ruie | d-BHC | 550 | 0.62 J |

83.     Beta BHC was detected in numerous homes throughout Forbes St., Nash Rd., and Forbes Terrace. Beta BHC also shows a strong correlation with distance from the Landfill, showing highest concentrations in the homes adjacent to the landfill demonstrating that the Landfill is the source of this contamination.

84.     Benzo-trichlorides are used extensively as a chemical intermediate in industry for the preparation of dyes. Its derivatives are used as UV stabilizers in plastic and to manufacture antiseptics and antimicrobial agents.

---

[10] Plaintiffs' sampling was put into a preliminary report for comparisons and explanation. This includes data from the Plaintiffs' 2019 sampling events and is attached hereto as Exhibit A-12.

85.     Benzo-trichlorides are classified as extremely hazardous substances (pursuant to 42 U.S.C. 11002), have no known consumer uses, and have been classified as a Group B2, probable human carcinogen. The substance can have effects on the lungs, liver, kidneys and thyroid. Acute exposure to benzo-trichlorides is irritating to the skin and mucous membranes in humans.

86.     Benzene is a known carcinogen. Some industries use benzene to make other chemicals that are used to make plastics, resins, and nylon and synthetic fibers. Benzene is also used to make some types of lubricants, rubbers, dyes, detergents, drugs, and pesticides.

87.     Exposure to benzene by inhalation can result in the following effects: drowsiness, fatigue, dizziness, rapid or irregular heartbeat, headaches, tremors, nosebleeds and/or irritation, memory loss and confusion. Exposure to benzene by ingesting can cause vomiting, irritation of the stomach/gastrointestinal effects, dizziness, sleepiness, convulsions, rapid or irregular heartbeat, and death (at very high levels).  Long term exposure to benzene can cause harmful effects on the bone marrow and can cause a decrease in red blood cells, leading to anemia. It can also cause excessive bleeding and can affect the immune system, increasing the chance for infection. Women exposed to benzene can experience irregular menstrual periods and decreased ovary size. Chemical manufacturers, including Hooker/Occidental, were aware of the highly toxic properties of benzene as early as 1946. Acute exposure to elevated air concentrations caused an anaesthetic effect on the central nervous system, which induced dizziness, headache, excitement and euphoria, and ultimately stupor, loss of consciousness and death due to paralysis of the respiratory center. Chronic exposures to low levels caused bone marrow toxicity, inducing anemia, decreased white blood cells, decreased platelets and increased immature forms of blood cells. In severe cases, this bone marrow toxicity was irreversible and could lead to death.

88.     Cadmium is a known human carcinogen. It is an extremely toxic metal commonly used in electroplating.

89.     Cadmium exposure may also affect lungs and kidneys, resulting in kidney impairment. Exposure to cadmium is associated with an increased risk of thoracic aortic aneurysm.

90.     Caustics are chemicals that are capable of burning or corroding by chemical action. Ingestion of caustic agents can cause direct injury to tissue upon exposure which can lead to oral pain, ulcerations, drooling, dysphagia (difficulty swallowing), vomiting, and abdominal pain. Dermal and ocular exposure to caustics can result in skin or eye irritation.

91.     Chlorobenzenes are aromatic organic compounds that are common industrial solvents often used as a chemical intermediate to make other chemicals, as a degreaser, and for some pesticide forumlations. Humans can be exposed to chlorobenzene by breathing contaminated air, by drinking water or eating food contaminated with chlorobenzene, or by getting chlorobenzene contaminated soil on the skin. According to the ATSDR, these exposures can occur in the vicinity of chemical or hazardous waste sites if emissions to water, air, and soil are not adequately controlled.

92.     Chlorobenzenes are irritating to the eyes and the skin and may cause central nervous system effects and can impact the inner ear.  Long-term exposure to Chlorobenzenes can result in neurotoxicity symptoms (including numbness, cyanosis, hyperesthesia (sensitivity to stimulus of the senses), and muscle spasms. Additionally, chlorobenzenes (as solvents) are known to increase the prevalence of asthma and allergic diseases. Exposure to industrial solvents has been linked to systemic autoimmune diseases such as Rheumatoid Arthritis and Lupus.

93.     Chlorobenzene exceeded NYSDEC groundwater standards or guidance values in groundwater samples at the Landfill.

94.     Chlordane is a man-made chemical that was used as a pesticide in the United States from 1948 to 1988. Chlordane is an extremely hazardous substance (pursuant to 42 U.S.C. § 11002) and has been classified as a Group B2, probable human carcinogen, by the EPA. It was

used as a pesticide in the United States from 1948 until it was banned in 1988.  Chlordane exposure is a risk factor for type-2 diabetes, prostate cancer, testicular cancer and breast cancer. Exposure to Chlordane and other organochlorine pesticides has been linked to systemic autoimmune diseases such as Rheumatoid Arthritis and Lupus. Chlordane was found in surface water on the Landfill in concentrations exceeding AWQSGVs.

95.     Chromium is used in electroplating and chemical manufacture and may cause   heritable genetic damage to human germ cells and effect human reproduction or development. It can cause skin rashes, ulcers, weakened immune systems, kidney and liver damage, and lung cancer.

96.     DDT (DDE and DDD) is an organochlorine (OC) pesticide that was used until it was banned in 1972 by the United States Government. DDE and DDD are breakdown products of DDT. DDT does not occur naturally in the environment. Since 1973, the use of DDT has been banned in the United States.

97.     The ATSDR has noted that DDT, DDE, and DDD last in soil for a very long time, potentially for hundreds of years. Exposure to DDT can occur near former waste sites contaminated with the chemical by accidentally swallowing soil, having skin contact with the soil, inhaling DDT vapor, or breathing in DDT in the dust.

98.     Studies have shown that exposure to DDT and other OC pesticides can cause ocular toxicity and damage to ocular tissue including the cornea, lens, retina, optic nerve, and conjunctive, as well as chloracne and other dermatological conditions and systemic autoimmune diseases such as Rheumatoid Arthritis and Lupus. People who swallow large amounts of DDT have become excitable and had tremors and seizures. They also experienced sweating, headache, nausea, vomiting, and dizziness. The same type of effects would be expected by breathing DDT particles in the air or by contact of the skin with high amounts of DDT. Tests in laboratory animals confirm

the effect of DDT on the nervous system (including causing neurotoxic effects and mental and psychological effects and disorders). Long term exposure to small amounts of DDT can cause changes in liver enzymes in the blood.

99.     Children exposed to DDT and other pesticides can suffer from neurological and behavioral developmental problems, including psychomotor and mental development and ADD/ADHD.

100.    Sampling and test results by nearby Plaintiffs in the Related Litigation demonstrate levels of DDT, DDD, and DDE many orders of magnitude higher than the background/control samples obtained. For example, a sample taken at 1597 Ruie Rd. contained 16,000 ug/kg of DDT as compared to 42 ug/kg in a control sample several miles away. A sample from that same home contained 1,900 ug/kg of DDE compared to 13 ug/kg of DDE in a control sample taken several miles away. A sample taken at 1430 Forbes contained 320 ug/kg of DDD compared to 9.4 ug/kg in a control sample taken several miles away.

101.    Dieldrin does not occur naturally in the environment and is no longer produced in the United States. Exposure to Dieldrin around hazardous waste sites can mainly occur by breathing contaminated air or touching contaminated soil. Exposure near hazardous waste sites can also occur by eating contaminated food or drinking contaminated water.

102.    Dieldrin is considered by NIOSH to be a potential occupational carcinogen. The EPA has determined that Dieldrin is a probable human carcinogen. Dieldrin accumulates in the body cause possible cumulative effects. Health effects in people exposed to smaller amounts of dieldrin occur because levels of the chemicals build up in the body over time. Exposure to moderate levels of dieldrin for a long time causes headaches, dizziness, irritability, vomiting, or uncontrollable muscle movements. Exposure to Dieldrin and other organochlorine pesticides has been linked to systemic autoimmune diseases such as Rheumatoid Arthritis and Lupus.

103.    Dioxin (2,3,7,8 tetrachlorodibenzoparadioxin- TCDD), dioxin-like substances, and furans are persistent organic pollutants and are considered some of the most toxic man-made compounds. Dioxin is one of the known compounds from the Love Canal landfill and was in the material deposited at the Landfill in this case.

104.    According to the World Health Organization, human exposure to dioxins and dioxin-like substances has been associated with a range of toxic effects, including immunotoxicity, developmental and neurodevelopmental effects, nosebleeds and/or irritation, fatigue, nerve damage, neuropathy and changes in thyroid and steroid hormones and reproductive function. Developmental effects are most sensitive health end-point, making children, particularly breastfed infants, the population most at risk. Short-term exposure to high levels of dioxins and dioxin-like substances can cause skin lesions or chloracne.  The International Agency for Research on Cancer (IARC) has classified Dioxin (TCDD) as carcinogenic to humans).

105.    Plaintiffs in the Related Litigation conducted sampling for Dioxin on properties within the community and near the Landfill. The tests results confirmed that those Plaintiffs and others in the community surrounding the Landfill were contaminated by Dioxin from the Landfill.

106.    For example, the maximum dioxin toxicity equivalent (midpoint TEQ) was 551 PPT in the set of all target homes versus a maximum of 17.8 (midpoint TEQ) for the control/background homes which were located several miles from the Landfill.  The table below shows this comparison[11]:

---

[11] Report from Boston Chemical Data showing Plaintiffs' testing and sampling, attached as Exhibit A-12.

| 2,3,7,8-substituted Dioxins & Furans: Maximum Values, target set vs. controls (PPT) | | | |
|---|---|---|---|
| Analyte | Targets | Controls | (ATSDR 1998) |
| TEQ mid point | 551 | 17.8 | 50 |
| 2,3,7,8-TCDD | 14.6 | 2.6 | <2.9 |
| 2,3,7,8-TCDF | 236 | 9.0 | <1.0 |
| OCDD | 313,000 | 1,850 | <3,300 |

Target homes maximum is at 26 Forbes Terrace, in the home closest to the Niagara Sanitation excavation site. Controls are in Williamsville, NY, 15.3 km SE of site. The ATSDR 1998 values are as follows: The 50 PPT is the ATSDR screening value, the 2,3,7,8-TCDF value is rural Ontario median, remainder are maximum background values. These are found in ATSDR TP104.

107.    Another example of the Dioxin contamination in the neighborhood from the Defendants' waste disposal at the Landfill is Dioxin (as OCDD at 9.8 ng/L) which was detected in the groundwater sample taken by Plaintiffs at 1430 Forbes St.

108.    Endrin (Endrin Aldehyde) was used as a pesticide and has not been produced or used in the United States since 1991. Because of this, the levels of endrin in environmental media are expected to be low. However, the ATSDR has recognized localized risks from exposure near waste disposal sites or from contaminated groundwater.

109.    Exposure to Endrin and other organochlorine pesticides has been linked to systemic autoimmune diseases such as Rheumatoid Arthritis and Lupus. Hexachlorocyclohexane is a possible human carcinogen.  It may affect the central nervous system, bone marrow, liver, sex hormones and genital system. Animal tests show that this substance possibly causes toxic effects upon human reproduction. Occidental Chemical Company recognized the toxicity of HCH isomers as early as 1945. HCH isomers were demonstrated to be very toxic to several rodent species, through oral, skin and subcutaneous administration. HCH isomers caused central nervous system excitation, convulsions and death, with pathological changes in multiple organs on autopsy. Early toxicity tests showed that the gamma isomer was the most toxic in a single oral dose, but the beta isomer was the most toxic in multi-dose sub-chronic testing. The beta isomer caused hypertrophy

and rapid cell division of the liver. There were sex- and age- related differences in the storage of these isomers in experimental animals.

110.   Human exposure to HCH isomers caused headache and irritation to the eyes, nose, pharynx, and skin. In 1948, the estimated fatal oral dose of lindane was about 0.5 ounce for humans. Fatal poisonings due to gama-HCH were reported as early as 1951. Poisonings could occur through ingestion or skin absorption. Symptoms of acute poisonings could include loss of consciousness and grand mal convulsions. As early as 1953, chronic poisonings were reported, which included symptoms due to severe anemia and easy bleeding (probably due to decreased platelets).

111.   Lindane (gamma- BHC) is an extremely hazardous substance (pursuant to 42 U.S.C. 11002) that was produced and used in the United States until 1976. Lindane was one of the known contaminants identified at Love Canal in early studies.

112.   Lindane is a neurotoxin that may cause effects on the central nervous system. The acute (short-term) effects of lindane through inhalation exposure in humans consist of irritation of the nose (and/or nosebleeds) and throat and effects on the blood.  Chronic (long-term) exposure to lindane by inhalation in humans has been associated with effects on the liver, blood, and nervous, cardiovascular, and immune systems. The major effects noted by the EPA from oral exposure to Lindane in humans are effects on the nervous system, such as seizures and convulsions. Vomiting, nausea, and effects on the cardiovascular and musculoskeletal systems have also been noted as effects due to oral exposure. Exposure to Lindane and other organochlorine pesticides has been linked to systemic autoimmune diseases such as Rheumatoid Arthritis and Lupus. Lindane exposure may result in death. Tumors have been detected in experimental animals indicating that it may have effects on the liver in humans. The EPA has recognized the concerning nature of

Lindane due to its persistence in the environment, potential to bioaccumulate, and toxicity to humans and the environment.

113.    Lead affects almost every organ and system in the human body; it can damage organs, cause permanent developmental disabilities, seizures, coma, neuropathy, and even death. Lead exposure is also known to cause premature birth. Studies have shown that lead exposure causes gout. Lead exposure has its strongest effect on children and child brain development. Children exposed to even low levels of lead often develop difficulties learning, and if the exposure does not stop, the damage will continue and is permanent.  The Centers for Disease Control (CDC) has determined that no safe blood lead level in children has been identified.[12]

114.    Mercury exposure can cause brain, kidney, and lung damage and may seriously harm a developing fetus. Exposure to even low levels of airborne mercury for prolonged periods of time can cause irritability, sleep disturbances, excessive shyness, tremors, coordination problems, changes in vision or hearing, and memory problems.

115.    Petroleum products, including hexane, benzene, toluene, xylenes, naphthalene, and fluorine, may cause damage to the lungs, central nervous system, liver, and kidneys. Toluene is a major component of adhesives, paints, lacquers, varnishes, printing inks, degreasers, fuel additives, glues, and thinners. Some petroleum compounds have also been shown to affect reproduction and the developing fetus in animals. Benzene is a known human carcinogen. Toluene can affect the central nervous system and the inner ear.

116.    Phenol is an extremely hazardous substance (pursuant to 42 U.S.C. 11002) and can cause respiratory irritation, headaches, and burning eyes. People who had skin exposure to high

---

[12] See: http://www.cdc.gov/nceh/lead/

amounts of phenol had skin burns, liver damage, irregular heart beat, and some died. Ingestion of high concentrations of phenol has resulted in internal burns and death.

117.    Plating tank sludge contains heavy metals, oil and grease and suspended solids at hazardous levels.

118.    PAHs or Polycyclic aromatic hydrocarbons are also present at the site. According to the ATSDR, people living near hazardous waste sites can be exposed to PAHs by breathing air containing PAHs; PAHs can enter your body if skin comes into contact with soil that contains high levels of PAHs (this could occur near a hazardous waste site); and swallowing soil or dust particles that contain PAHs are other routes that PAHs can enter the human body. The Centers for Disease Control and Prevention and the International Agency for Research on Cancer (IARC) characterize PAHs as probable carcinogens, associated with risk of lung, genitourinary, and skin cancers. Additionally, PAHs are known endocrine disruptors.

119.    PCBs are an odorless group of volatile synthetic organic chemicals and are either oily liquids or solids.  PCBs enter the environment as mixtures containing a variety of individual chlorinated biphenyl components, known as congeners, as well as impurities.

120.    Prior to 1974, PCBs were used both for nominally closed applications (e.g., capacitor and transformers, and heat transfer and hydraulic fluids) and in open-end applications (e.g., flame retardants, inks, adhesives, microencapsulation of dyes for carbonless duplicating paper, paints, pesticide extenders, plasticizers, polyolefin catalyst carriers, slide-mounting mediums for microscopes, surface coatings, wire insulators, and metal coatings).

121.    In 1976, the U.S. Congress charged EPA with regulating the manufacture, processing, distribution in commerce, and use of PCBs; the first set of effluent standards for PCBs was issued by the EPA in 1977. After subsequent amendments, the production of PCBs in the United States is generally banned.

122.     Once released into the environment, PCBs do not readily break down and therefore remain for long periods of time cycling between air, water, and soil.

123.     PCBs have been demonstrated to cause cancer, as well as a variety of other adverse health effects on the immune system, reproductive system, nervous system, and endocrine system (Pancreas, adrenal glands, thyroid gland, pituitary gland, testes, ovaries, and thymus). PCBs are also known to cause significant dental defects in exposed populations as well as nosebleeds and/or irritation, and fatigue. PCBs have also been linked to high cholesterol and weight loss/appetite suppression.

124.     The manufacture of PCBs was stopped in the U.S. in 1977 because of evidence they build up in the environment and can cause harmful health effects.

125.     Sampling and test results by nearby Plaintiffs in Related Litigation demonstrate levels of PCBs many orders of magnitude higher than the background/control samples obtained several miles away. For example, in Related Litigation, a sample from 1389 Forbes contained 739.0 ppt of PCBs-TEQ$_{mid}$ compared to 13.3 ppt of PCBs-TEQ$_{mid}$ in a control sample taken several miles away.

126.     The NYS residential soil cleanup objective "SCO" for PCBs is 1 part per million (mg/kg). A number of Plaintiffs' samples in the Related Litigation exceeded the SCO.  At 1389 Forbes St., indoor dust contained 19.8 mg/kg of PCBs as Aroclor 1254. This Aroclor is the one most commonly found in Love Canal wastes (Env. Mon. at Love Canal, Interagency Rev., 1982). Total PCB concentration in indoor dust at 1630 Nash Rd. (adjacent to the Niagara Sanitation entrance road) was 30.3 mg/kg. By comparison, NYS DOH background data for a study of Carthage, NY (2009) found a background concentration of 0.0055 to 0.09 mg/kg total PCBs.[13]

---

[13] See Exhibit A-12.

127.    The community surrounding the Landfill, including the properties and homes of Plaintiffs in Related Litigation, has been contaminated by PCBs that have migrated from the Landfill.

128.    Upon information and belief, all the above-referenced contaminants, and their derivatives, in amounts and concentrations above State and Federal residential safety levels, were and continue to be released, discharged, and disbursed throughout the neighborhood from the Site.

## EXPOSURE PATHWAYS

129.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

### A.  SURFACE SOIL, SURFACE WATER, AND AIR DISPERSION

130.    **Dermal Contact, Ingestion, and Inhalation:** In its February 2019 Remedial Investigation Report, NYSDEC stated that "Under the current use scenario, trespassers on the site would have a potentially complete pathway through dermal contact or ingestion of contaminated soil or surface water.  Nearby residents could potentially be exposed through inhalation of contaminated soil from wind dispersion of fugitive dust from the site to off-site areas. Nearby residents could potentially be exposed through dermal contact or ingestion of surface water in the northern swale area (a portion of which is off-site and outside of the perimeter fence)." [14]

131.    As described more fully in individual Plaintiff paragraphs below, many Plaintiffs were exposed to the toxic and hazardous chemicals at the Site, including the Love Canal materials, through dermal contact and ingestion of contaminated soil and surface water while present on the unrestricted landfill as children or adults who visited the Landfill. While there is a fence/physical barrier to entry today, it was only installed in 2017. Prior to that many Plaintiffs who grew up and

---

[14] See Exhibit A-9, page 35.

lived in the area for decades visited the Site, believing it was an open greenspace and wooded recreation area near their childhood homes.

132.   Additionally, the Landfill is prone to flooding and the flow of contaminated surface water occurs offsite and to Plaintiffs' Property. Plaintiff Jilynn Eagen, including while pregnant with Plaintiff E.E. and thereafter, lived and visited the Property, which is immediately adjacent to or within just a few blocks of the Landfill, easily permitting the migration of surface water.

133.   Plaintiffs have been and will continue to be exposed to the toxic and hazardous chemicals from the Site, including Love Canal materials, through inhalation of fugitive dust/contaminated soil from the Landfill while in the Property's neighborhood and/or on their property.

134.   A perimeter chain link fence at the Landfill is incapable of stopping the fugitive contaminated soil from the Landfill and preventing the airborne migration of these contaminants to Plaintiffs' Property. Plaintiff Jilynn Eagen, including while pregnant with E.E. and thereafter, was exposed, lived, or visited the Property immediately adjacent to or within just a few blocks of the Landfill, easily permitting the migration of soil via air dispersion.

135.   The NYSDEC's 2019 Report further states "Under the future use scenario, trespassers on the Site would have a potentially complete pathway through dermal contact or ingestion of contaminated soil or surface water.  Nearby residents could potentially be exposed through inhalation of fugitive dust from the site to off-site areas. Nearby residents could potentially be exposed through dermal contact or ingestion of surface water in the northern swale area (a portion of which is off-site and outside of the perimeter fence)."[15]

---

[15] Id.

136.   The recognized Completed Potential Human Exposure Pathways[16] identified by the NYSDEC in its 2019 Report are identified below:

**Completed Potential Human Exposure Pathways**

| On-Site or Off-Site | Exposure Point to Site COPCs | Exposure Route | Potentially Exposed Population |
|---|---|---|---|
| On-Site | Surface Water (Within Perimeter Fence) | Dermal Contact Incidental Ingestion Incidental Inhalation | Maintenance Worker Utility Worker Trespasser |
| | Surface soils | Dermal Contact Incidental Ingestion | Maintenance Worker Utility Worker Trespasser |
| | Subsurface soils | Dermal Contact Incidental Ingestion | Utility Worker |
| Off-Site | Surface Water (In Northern Swale/Ditch Beyond Perimeter Fence) | Dermal Contact Incidental Ingestion Incidental Inhalation | Maintenance Worker Utility Worker Resident Adult Resident Child |
| | Surface soils | Incidental Inhalation of Fugitive Dust | Maintenance Worker Utility Worker Resident Adult Resident Child |

## B. GROUNDWATER AND SOIL VAPOR INTRUSION

137.   Groundwater sampling was conducted at the Landfill in 1988. The NYSDEC summarized the groundwater sample location with exceedances of the NYSDEC groundwater standard in its 2019 Report. The summary table is included below[17]:

---

[16] Id. at, p.35.
[17] Exhibit A-9,  Table 5-17

**TABLE 5-17**
**SUMMARY OF SITE GROUNDWATER**
**HSL ORGANICS**
**FEBRUARY AND NOVEMBER 1988**
**NYSDEC - NIAGARA SANITATION SITE, SITE #932054**
**TOWN OF WHEATFIELD, NEW YORK**

| Well Number<br>Sample Date<br>Well Screen Interval (feet bgs)<br>Screened Unit | NYSDEC<br>Groundwater<br>Standard ● | OW-11<br>02/17/88<br>7.0-9.0<br>Sand | OW-12<br>02/17/88<br>29.5-32.5<br>Sand | OW-14B<br>02/17/88<br>3.0 - 7.0<br>Sand | OW-16<br>02/18/88<br>5.0 - 10.0<br>Fill/SC |
|---|---|---|---|---|---|
| HSL Organic Compunds (ug/L) | | | | | |
| 1,1,1-Trichloroethane | 5 | 67 J (f) | | | |
| 4-Methylphenol | *1 | | | | 25 |
| Acetone | 50 | 2,300 (f) | | | |
| Benzene | 1 | 4,500 (f) | | | 12 |
| Bis[2-ethylhexyl]phthalate | 5 | | 1,600 B | 720 BX | |
| Chlorobenzene | 5 | 590 (f) | | | 25 |
| Ethylbenzene | 5 | | | | 55 |
| Methylene Chloride | 5 | 240 J (f) | | | |
| Tetrachloroethene | 5 | | 110 JX | 120 JX | 67 JX |
| Toluene | 5 | 14,000 (f) | | | 5.2 |

138.    By 1988, the Defendants' toxic and hazardous waste materials had already reached the groundwater and contaminated it at levels exceeding New York State standards. Migration of contaminated groundwater to Plaintiff Property had already been ongoing for decades by this time.

139.    The NYSDEC conducted groundwater sampling at the Landfill on multiple occasions since 2013. For the groundwater (fill/upper sand), it found numerous exceedances of toxic and hazardous chemicals known to be associated with the Defendants' waste, including Love Canal material, at levels that exceeded the Ambient Water Quality Standards and Guidance Values "AWQSGVs". Many of these groundwater samples were taken following the alleged removal of the Love Canal material. These results are summarized in the table below included in the 2019 NYSDEC Report:[18]

---

[18] Exhibit A-9, p. 33

**Summary of Maximum Concentrations of COPCs Reported Above AWQSGVs Since 2013**

| Contaminant | Contaminant Class | NYSDEC TOGS 1.1.1 AWQSGV | Units | Max. Detected Concentration | Sample ID | Sample Date |
|---|---|---|---|---|---|---|
| 1,4-Dichlorobenzene | VOC | 3 | µg/L | 5.4 | OW-24 | 8/2/2013 |
| Ethylbenzene | VOC | 5 | µg/L | 200 | OW-36 | 5/19/2014 |
| Isopropylbenzene | VOC | 5 | µg/L | 13 | OW-36 | 5/19/2014 |
| Xylene, Total | VOC | 15 | µg/L | 1,700 | OW-36 | 5/19/2014 |
| 4-Chloro-3-Methylphenol | SVOC | 1 | µg/L | 7.5 | OW-36 | 5/19/2014 |
| 2-Methylphenol | SVOC | 1 | µg/L | 1.8 | LPZ-08S | 8/29/2017 |
| 4-Methylphenol | SVOC | 1 | µg/L | 17 | LPZ-05S | 8/2/2017 |
| Biphenyl | SVOC | 5 | µg/L | 39 | OW-36 | 8/29/2017 |
| Nitrobenzene | SVOC | 0.4 | µg/L | 0.89 | OW-2 | 8/2/2013 |
| Phenol | SVOC | 1 | µg/L | 4.6 | OW-36 | 8/29/2017 |
| Aldrin | Pesticide | ND | µg/L | 0.085 | OW-16 | 8/2/2013 |
| Alpha-BHC | Pesticide | 0.01 | µg/L | 0.33 | OW-22 | 8/2/2013 |
| Alpha-Chlordane | Pesticide | 0.05 | µg/L | 0.10 | OW-16 | 8/2/2013 |
| Beta-BHC | Pesticide | 0.04 | µg/L | 0.12 | LPZ-08S | 8/29/2017 |
| Delta-BHC | Pesticide | 0.04 | µg/L | 0.096 | OW-16 | 8/2/2013 |
| Dieldrin | Pesticide | 0.004 | µg/L | 0.089 | OW-16 | 8/2/2013 |
| Gamma-BHC (Lindane) | Pesticide | 0.05 | µg/L | 0.095 | OW-1 | 8/2/2013 |
| Gamma-Chlordane | Pesticide | 0.05 | µg/L | 0.072 | OW-13 | 8/2/2013 |
| Endrin | Pesticide | ND | µg/L | 0.070 | OW-32 | 5/19/2014 |
| Arsenic | Metal | 25 | µg/L | 55 | LPZ-03S | 8/21/2017 |
| Barium | Metal | 1,000 | µg/L | 1,100 | OW-35 | 8/30/2017 |
| Iron | Metal | 300 | µg/L | 41,500 | LPZ-10S | 9/2/2017 |
| Lead | Metal | 25 | µg/L | 39 | OW-22 | 8/2/2013 |

Notes: µg/L = micrograms per liter (parts per billion)

140.    In 2015, Occidental Chemical Corporation conducted sampling at the Site, following the excavation and removal of some of the buried Love Canal waste from the Site.   The data, included in the 2016 Interim Remedial Measure Report and attached to the NYSDEC 2019 Investigation Report, indicate numerous exceedances of safety standards in the onsite samples.

141.    The historic and more recent NYSDEC sampling demonstrate that groundwater contamination at the unlined Landfill from the Defendants' waste has been documented for decades.

142.    Plaintiffs in Related Litigation conducted groundwater sampling in 2019.

143.    The results of the above sampling demonstrate that groundwater from the Landfill flows toward Plaintiffs' Property.

144.    In addition, Plaintiffs in the Related Litigation have obtained an offsite groundwater sample from a nearby resident's property adjacent to and south of the Landfill that demonstrates the presence of Dioxin in groundwater outside the bounds of the Landfill, which is considered one of the deadliest substances known to man and one of the known contaminants from Love Canal.

145.    Based on sampling, groundwater contaminated by Defendants' hazardous and toxic chemicals has migrated offsite to Plaintiffs' property, contaminating the subsurface soils and causing contamination through groundwater seepage and soil vapor intrusion.

146.    Additionally, the EPA has chosen to sample and test basement sumps as a means of detecting chemicals infiltrating due to subsurface transport (Love Canal Emergency Declaration Area Habitability Study, Final Report, Volume I: Introduction and Decision-Making Documentation, 1988).

147.    Numerous samples were taken from Plaintiffs' basement sumps in the Related Litigation. These show high concentrations of chemicals known to be at the Landfill, including the Love Canal toxins.

148.    The hazardous and toxic stew of chemicals migrated from the Landfill in the groundwater (contaminated with Defendants' waste) to Plaintiffs' property.

149.    These hazardous and toxic chemicals entered Plaintiffs' home through groundwater seepage, through sumps, and through soil vapor intrusion into their homes. The contamination has been infiltrating Plaintiffs' home since the Defendants disposed of their toxic and hazardous chemicals since there was nothing in place to prevent the contamination of the groundwater and subsequent migration.

150.    There are no physical or engineering barriers in place to prevent the flow of contaminated groundwater from the Landfill to properties, including Plaintiffs' Property, that are within the groundwater flow paths, including Plaintiffs' property.

151.    Because groundwater contaminated with Defendants' hazardous and toxic chemicals (including Love Canal material) has migrated offsite, soil vapor intrusion has proven to be another pathway for the contamination to reach Plaintiffs' persons and Property. The below figure[19] is from the EPA and depicts the migration of vapors in soil gas from contaminated soil and groundwater into buildings, like Plaintiffs' homes. Vapors in soil gas are shown to enter building through cracks in the foundation and openings for utility lines.



152.    The contamination has been allowed to continue to migrate onto and into Plaintiffs' Property since Defendants' disposal operations began and since the Love Canal material was

[19] https://www.epa.gov/vaporintrusion/what-vapor-intrusion. While the figure notes VOCs as the example, the EPA's website notes that this is for "vapor-forming chemicals" which include VOCs (such as trichloroethylene and benzene), SVOCs (such as napthalene), elemental mercury, and some PCBs and pesticides.

deposited at the Landfill, causing Plaintiffs to suffer ongoing injuries, including significant health impairments and damage to their property, as well as putting them at high risk for future, latent diseases and cancers.

153.    The contamination continues to be released, dispersed or otherwise discharged via surface water, groundwater, and air onto Plaintiffs' property and persons to the present date.

154.    New York State DEC data, depicted below, demonstrates groundwater flow toward Plaintiffs' Property. [20]



155.    Additionally, sampling data and public documents indicate that Plaintiffs' property has been infiltrated by toxic components of the wastes disposed by or for Defendants through

---

[20] A copy is also attached as a full page as part of Exhibit A-12 at p. 14.

groundwater seepage, soil vapor intrusion, and surface water runoff from the Landfill which caused and/or continues to cause a trespass on Plaintiffs' Property and an interference with the right to possess and enjoy Plaintiff's real property. Groundwater seepage and soil vapor intrusion of Defendants' hazardous and toxic chemicals has caused and continues to cause Plaintiffs' home to be contaminated with these substances.  Due to the contamination through this and other pathways, Plaintiffs have been and continue to be directly exposed to Defendants' toxic and hazardous materials.

156.    Plaintiffs have obtained an offsite groundwater sample from a neighbor's property that demonstrates the presence of Dioxin in groundwater outside the bounds of the Landfill, which is considered one of the deadliest substances known to man and one of the known contaminants from Love Canal.

157.    As of the date of this filing the Town of Wheatfield and the DEC continue to state publicly that there is no cause for concern, that contamination has not been released outside of the Site on to private property, and that there has been no impact to residents' property or health.

## **PLAINTIFFS**

158.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

159.    Plaintiffs, their persons, and property have been exposed to a mixture of toxic and hazardous chemicals which were deposited at various times by Defendants at the Landfill, and began continuously seeping out of and migrating from the unlined Landfill. The various wastes were deposited with no engineered controls in place to prevent the immediate migration. Moreover, the various wastes migrated to the Plaintiffs' home as a result of drainage conditions, man-made migration routes, including a brine pipeline, topographical factors, and the fact that Defendants negligently punctured any alleged clay layer under or around the dumpsite, or failed

to disclose the impact of these punctured clay layers.  This migration and infiltration is ongoing today and continues to impact Plaintiffs' home through air, soil, groundwater, dust, and surface water.

160.    The chemicals in this mixture have additive and synergistic effects which can cause additional health impacts beyond the individual chemicals that were originally deposited and together are considered harmful to every human body system. Additionally, Plaintiffs' exposure to Defendants' toxic and hazardous chemical waste stew (which includes Dioxin, Benzene, and a number of known carcinogens identified above) has increased their chances of developing cancer. Further, studies have shown that exposure to environmental toxicants (such as the Defendants' hazardous and toxic substances) can cause life-long changes in response to infectious agents and in the homeostasis of the immune system.

161.    Plaintiffs currently reside at 3733 Trails End Lane, North Tonawanda, New York, 14120.

162.    Plaintiff Jilynn Eagen is a previous occupant, current owner and, until recently, regular visitor of 1134 Niagara Falls Boulevard, a residential property in the affected area (hereinafter "the Property"). She resided at the Property for twenty-seven years, from 1989 to 2016 and for another six months, from June 2019 to November of 2019

163.    Between the remainder of 2016 to May 2019, and after 2019, she  regularly visited the Property until 2022, including while she was pregnant with her minor child, Plaintiff E.E., in 2021, and spent significant and ongoing time there, along with Plaintiffs Edward Eagen and E.E. Ms. Eagen has had substantial exposure to the contamination from the Site during the periods of residency and visitation, described above, due to the presence of contamination within the home from the Landfill and its ongoing nature.

164.     Plaintiff Jilynn Eagen also regularly spent time in the yard and ingested, inhaled, and had direct dermal contact with surface and subsurface soil and materials. As a younger person, Jilynn Eagen recreated on the Site property, and had direct dermal contact with surface soil, standing water and materials at the Site. In addition to being exposed to Defendants' chemicals in those ways, the chemicals also migrated to her property and entered her home before and during her occupancy and visitation through air, dust, groundwater migration and subsequent seepage and vapor intrusion, as well as surface water runoff from the Landfill to her nearby home.

165.     Plaintiff Jilynn Eagen has suffered and continues to suffer from personal injuries caused by and/or contributed to by exposure to Defendants' toxic and hazardous chemicals, including, but not limited to: chronic, debilitating migraines and preeclampsia during pregnancy.

166.     Plaintiff Jilynn Eagen's debilitating and chronic migraines are caused by exposure to Benzene, Aldrin, BHC, Phenol, DDT,  Dieldrin, and other heavy metals and pesticides disposed of at the Landfill by Defendants.

167.     Plaintiff Jilynn Eagen's preeclampsia was caused by or contributed to by exposure to cadmium and barium, at a minimum, disposed of at the Landfill.

168.     As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling, and/or disposing of hazardous substances into the area surrounding his home, Jilynn Eagen has developed significant debilitating personal injuries. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Eagen has suffered and continues to suffer severe physical injury, pain, and suffering.  Ms. Eagen brings suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, medical monitoring, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

169.     Plaintiff Jilynn Eagen and her husband, Edward Eagen, are the natural parents of Plaintiff E.E. (a minor daughter). Plantiffs Jilynn and Edward Eagen assert claims on Plaintiff E.E.'s behalf based on her mother's residence at 1134 Niagara Falls Boulevard, North Tonawanda, NY 14120, for approximately twenty-seven and a half years, from 1989 to 2016, and for another six months from June 2019 to November of 2019, and her regular visits to the Property in between and thereafter.   E.E. has had substantial exposure to carcinogenic and teratogenic agents while in utero and after her birth. E.E. spent a significant amount of time at this location as it was also the residence of her grandparents, and had substantial exposure to the contamination from the Site since Defendants' disposed of their toxic and hazardous contaminants which began migrating immediately from the unlined landfill following disposal. E.E. has personal injuries, and seeks medical monitoring due to this exposure.

170.     Plaintiff alleges that her mother's exposure to carcinogenic, neurotoxic, mutagenic, and teratagenic agents from Defendants' toxic and hazardous substances, and/or her own exposure while in utero or thereafter, is the cause of some or all of her personal injuries.

171.     In December 2021, Plaintiffs Jilynn and Edward Eagen learned that E.E. had a large Neuroblastoma tumor that was connected through her spine, with parts bulging at the top and bottom.

172.     Plaintiff E.E. has suffered and continues to suffer from personal injuries caused by and/or contributed to by to Defendants' toxic and hazardous chemicals, including, but not limited to: Neuroblastoma, and cascading effects, injuries, and diagnoses as a result of that catastrophic diagnosis and eight rounds of chemotherapy.

173.     Plaintiff E.E. suffers from a neurogenic bladder, an inability to walk, spinal damage, and numerous other life-long impacts.

174.    Plaintiff's neuroblastoma was caused and/or contributed to by exposure to dioxin, PAHs, pesticides, lead, benzene and other BTEX, and chlordane disposed of at the Landfill.

175.    Plaintiff Edward Eagen joins Plaintiff Jilynn Eagen in bringing this lawsuit on behalf of his daughter, E.E. and also brings claims on his on behalf for loss of consortium, society, and companionship. His claim is based upon her exposure, and the fact that he and Plaintiff Eagen have lost her society and companionship, as a result of E.E.'s many hospitalizations and periods of incapacitation. His claim is also based on the fact that his wife, Jilynn Eagen, has substantial periods of incapacitation as a result of her debilitating migraines. Plaintiffs Edward and Jilynn have also incurred substantial medical bills for E.E.'s care and ongoing medical issues. These injuries are all as a result of Defendants' negligence in the processing, distribution, transporting, storing, handling, and/or disposing of hazardous substances and the failure to warn residents that these materials were exceedingly toxic and had already migrated.

176.    As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling, and/or disposing of hazardous substances into the area surrounding her mother's family home and her grandparents' home, as well as they failure to warn residents that these materials were exceedingly toxic and had already migrated, E.E. has developed significant debilitating personal injuries.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, E.E. has suffered and continues to suffer severe physical injury, pain, and suffering. Plaintiffs Edward Eagen and Jilynn Eagen bring suit on behalf of E.E. against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, medical monitoring, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

177.    Plaintiffs Jilynn Eagen and E.E. were personally exposed and continue to be exposed to hazardous and toxic substances, contaminants, and pollutants from the above

mentioned Site via ingestion, inhalation, and or/dermal contact, during normal day activities such as walking in the neighborhood and the Site property, gardening and doing yard work, playing in their yards, as well as living in their home.

178.    Upon information and belief, the Property has also been infiltrated by toxic components of the wastes disposed of, by, or for Defendants through groundwater seepage, soil vapor intrusion, and surface water runoff from the Landfill. This has resulted in continuing trespass, interference with the possession and use of their Property, and additional exposures impacting their health.

179.    Plaintiffs are an 'exposed population' as defined in Section 6.8.1 of the ATSDR Public Health Assessment Guidance Manual as follows:

180.    A population is considered exposed if a completed exposure pathway, which links a contaminant with a receptor population, exists in the past, present, or future. An exposed population includes persons who ingest, inhale, or contact site contaminants or are exposed to radiation in the past, present, or future. Examples of exposed persons include those who:

- *have ingested, are ingesting, or will ingest the contaminant from one or more environmental media;*
- *have inhaled, are inhaling, or will inhale the contaminant from one or more environmental media;*
- *have contacted, are contacting, or will contact the contaminant in one or more environmental media; and*
- *were exposed, are exposed, or will be exposed to gamma radiation from one or more environmental media.*

*If an environmental medium (soil) contains a contaminant of concern at a point of exposure (a residential yard), and evidence already exists that a route of exposure (ingestion) has occurred, is occurring, or will occur, the health assessor should assume that persons living at that residence are exposed or will be exposed. If the residential yard contains a vacant house, the health assessor should assume that future residents will be exposed. Persons should also be considered exposed if exposure has been verified by human biologic measurements or medical examination. For health assessments, human biologic measurements or medical examination are not necessary for the assignment of an exposure category to a population.*

## DEFENDANTS

181.    Defendant, TOWN OF WHEATFIELD, individually and as Successor in Interest to NIAGARA SANITATION COMPANY ("WHEATFIELD"), is a municipal corporation founded in 1836 located in the southern portion of Niagara County, New York.

182.    WHEATFIELD is now and at all times relevant to this action was the owner of the Nash Road Landfill.

183.    WHEATFIELD at all times relevant to this action was the operator of the Nash Road Landfill.

184.    Upon information and belief, the Nash Road Landfill operated from approximately 1955 to 1969.  During all time relevant to this action WHEATFIELD, as owner of the Landfill, contracted with NIAGARA SANITATION COMPANY to operate said Landfill on behalf of WHEATFIELD.

185.    Upon information and belief, defendant WHEATFIELD accepted chemical, industrial, and hazardous waste for disposal at the Nash Road Landfill.

186.    Defendant WHEATFIELD did not adequately control the Landfill or properly segregate the chemical waste from regular municipal waste. It did not heed numerous complaints about the improper operation and maintenance of the Landfill, the evidence of hazardous materials and exposure by residents using the unfenced area for recreation, and the demands of local and state agencies to close, cap, remediate, and otherwise minimize the dangers posed by the Landfill.

187.    Defendant WHEATFIELD repeatedly assured Plaintiffs and the community surrounding the Landfill that the Landfill was safe and there was no need for concern.  The Town's deliberate indifference and failure to take the necessary steps to remediate and mitigate the threats posed to nearby residents by the Site continue to this day.

188.    NIAGARA SANITATION COMPANY, in addition to operating the Landfill on behalf of WHEATFIELD, was also a generator and transporter of hazardous waste disposed of at the Landfill.

189.    Upon information and belief, THE CARBORUNDUM COMPANY, either directly or through its subsidiaries and related corporate entities ("CARBORUNDUM") operated several manufacturing facilities from 1895 to approximately the mid-1970s.

190.    The NYSDEC, Division of Hazardous Waste Remediation, identified THE CARBORUNDUM COMPANY as one of the disposers of hazardous wastes at the Landfill.

191.    Defendant, CROWN BEVERAGE PACKAGING, LLC individually and as Successor in Interest to CONTINENTAL CAN ("CONTINENTAL"). CROWN BEVERAGE PACKAGING, LLC is a foreign Limited Liability Company authorized to do business in New York State.  CONTINETAL manufactured tin cans, and expanded over the years to other metals, paper and fiber containers, crown caps, and plastics.

192.    Upon information and belief, during all times relevant to this action defendant CONTINENTAL CAN operated a facility in Tonawanda, New York.

193.    Upon information and belief, defendant CONTINENTAL CAN disposed of industrial and/or chemical waste at the Nash Road Landfill. The NYSDEC, Division of Hazardous Waste Remediation, identified CONTINENTAL CAN as one of the disposers of hazardous wastes at the Landfill.

194.    CONTINENTAL CAN was a generator and/or transporter of hazardous waste disposed of at the Landfill.

195.    Defendant, GREIF, INC individually and as Successor in Interest to GREIF BROS. COOPERAGE CORPORATION ("GREIF"). GREIF, INC is a foreign Limited Liability Company authorized to do business in New York State.  The company manufactured industrial

packaging systems carrying such products as steel containers, fiber drums, plastic drums, bulk containers, water bottles, container closure systems, corrugated containers, dunnage products, protective packaging, multiwall packaging, and containerboard at its Niagara Falls, Canada plant.

196.    Upon information and belief, defendant GREIF disposed of industrial and/or chemical waste at the Nash Road Landfill. The NYSDEC identified GREIF as one of the disposers of hazardous wastes at the Landfill.

197.    GRIEF was a generator and/or transporter of hazardous waste disposed of at the Landfill.

198.    REPUBLIC SERVICES, INC. individually and as Successor in Interest to NIAGARA SANITATION COMPANY, INC.

199.    Upon information and belief, defendant NIAGARA SANITATION COMPANY, INC. accepted chemical, industrial, and hazardous waste for disposal at the Nash Road Landfill.

200.    Defendant NIAGARA SANITATION COMPANY, INC. did not adequately control the Landfill or properly segregate the chemical waste from regular municipal waste; did not line the landfill or provide adequate cover for the refuse, did not act to prevent leaching of hazardous wastes from the disposal areas; did not warn nearby residents of the health hazards posed by the wastes; and did not take appropriate measure to contain the waste on site.

201.    Upon information and belief, defendant NIAGARA SANITATION COMPANY, INC. disposed of industrial and/or hazardous waste at the Nash Road Landfill.

202.    When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation

or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

203.    The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

204.    Upon information and belief, each of the Defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

### COUNT I: 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER
### (Against Town of Wheatfield)

205.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

206.    Plaintiffs, in this action, are citizens of the United States or lawful permanent residents and all of the Defendants are persons for purposes of 42 U.S.C. § 1983.

207.    Defendant Town of Wheatfield was, at all times relevant hereto, acting under the color of law during its past and continuing actions against Plaintiffs, and using its effective control over the private entity operating the Nash Road Landfill during the relevant period.

208.    Upon information and belief, Defendant officials and private agents with decision-making authority, including but not limited to former City Supervisor Stanley Brzezinski, Landfill Operator Angelo Zino, Peace Justice Fred Lemke, and others not yet known to Plaintiffs,

affirmatively acted to create and exacerbate toxic contamination in the Wheatfield's Nash Road dump.

209.    Upon information and belief, in and/or around 1968, Town of Wheatfield officials and Board members including but not limited to: Peace Justice Fred Lemke and Supervisor Stanley Brzezinski, actively sought and/or approved of the disposal of highly toxic chemicals from the Love Canal site.

210.    Despite the fact that the Town of Wheatfield and its private associates, in operating the Nash Road disposal site had repeatedly violated detailed regulatory directives and complaints of the Niagara County Health Department, they nonetheless disposed of these dangerous chemicals fully knowledgeable of the contamination risk to families, including those with young children just a few hundred feet away from the facility.

211.    Town of Wheatfield officials participated in the pre-disposal approval process for the dumping of highly toxic Love Canal materials in the Nash Road Landfill despite the fact that concerns about landfill run-off and drainage, proximity of the landfill to residents, use of the landfill as a play area for children, and health threats were articulated by the Niagara County Department of Health and neighbors to the Landfill in the years preceding the dumping of the Love Canal Waste and in the years following.

212.    While repeatedly and purposely circumventing the regulatory directives by the Niagara County Department of Health, Defendant and its private associate also ignored and/or deceived the authors of countless citizen complaints about the progress of the Nash Road dump.

213.    Neighbors and Plaintiffs in the Related Litigation warned Defendant, the Niagara County Department of Health, and Niagara Sanitation in complaint letters and other communication that the operation of the dump was endangering the lives of children and posing a

health risk to the community–yet instead of taking action to mitigate the danger–Defendant took affirmative steps to increase a danger it had already created.

214.   In or around September 1968, Defendant was given notice that the County Department of Health wanted it to take immediate steps to begin refuse disposal at another suitable facility and prepare the Nash Road site for permanent closure; a month later it is Plaintiffs' belief Defendant was still encouraging the operation of the dump, increasing the already present danger it created.

215.   In or around October 1968, Defendant was given a grave warning by the Niagara County Health Department: the disposal of "domestic refuse" in "close proximity" to the "[Love Canal] waste" recently buried there, and the use heavy machinery to dispose of it, posed a great risk of toxic atmospheric exposure.

216.   Defendant's reckless disregard for the safety of adjacent lives is evident in its encouragement of the continued operation of the facility even after it was told to immediately find a new location.

217.   After deliberately ignoring directives and complaints from the County Health Department, the effects of Defendant's landfill continued to take a toll on Plaintiffs, from grading issues which move contaminated water from the dump to Plaintiffs' yards to horrific odors which sicken.

218.   Even worse, Plaintiffs have information tending to show Defendant took active steps to conceal the risks, and Defendant continues today to deny the toxic effects of the chemicals it actively disposed of and indifferently and recklessly operated around, resulting in the exposure of Plaintiffs and their resulting injuries.

219.   The nature of the actions and inactions of Town of Wheatfield officials and its private agents in maintaining the Nash Road Landfill created a culture of deliberate indifference

about the safety and conditions of the Nash Road Landfill and its potential impact to Plaintiffs. These repeated behaviors by Town of Wheatfield officials created a custom that was as influential as a policy or procedure. This custom and the pattern of related actions and inactions condoned and effectuated the wrongdoing of individual government officials.

220.   Plaintiffs herein at all times relevant hereto, have a clearly established Constitutional right under, inter alia, the Fourteenth Amendment, such that a Town or other state-actor cannot deprive a person of their life, liberty, or property without due process of law.

221.   Defendant Town of Wheatfield deliberately and knowingly breached Plaintiffs' constitutionally protected bodily integrity by creating and perpetuating the exposure of toxic chemicals through its actions of disposal and its encouragement of private parties' reckless operation of machinery that imperiled the bodies of Plaintiffs.

222.   The Defendant's actions and the inevitable and foreseeable consequences that flowed from them are so egregious, as to shock the conscience of any reasonable person in contemporary society.

223.   Defendant's actions exposed the Plaintiffs to toxic contaminants and industrial solvents, including but not limited to Aldrin, Arsenic, Barium, BHC (Benzene Hexachloride), Benzo-trichlorides, Benzene, Caustics, Chlordane, Chlorobenzenes, Chromium, OC Pesticides, DDT, DDE, and DDD, Dieldrin, Dioxin, Endrin (Endrin Aldehyde), Hexachlorocyclohexane, Lindane (gamma- BHC), Lead, Mercury, Petroleum products (including hexane, benzene, toluene, xylenes, naphthalene, and fluorine), Plating tank sludge, Phenol, PAHs or Polycyclic aromatic hydrocarbons, polychlorinated biphenyls  or PCBs and Love Canal wastes identified herein.

224.   Plaintiffs do not allege that Defendant was executing the actions above through the mechanism of its legislative function.

## COUNT II: 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY

### (Against Town of Wheatfield)

225. Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

226. Plaintiffs, in this action, are citizens of the United States or lawful permanent residents and all of the Defendants are persons for purposes of 42 U.S.C. § 1983.

227. Defendant Town of Wheatfield, at all times relevant hereto, was acting under the color of law, and its acts and/or omissions were conducted within the scope of its official duties.

228. Plaintiffs have a clearly established right to bodily integrity under the Fourteenth Amendment. At all times relevant hereto, that right is and has been well established.

229. Defendant Town of Wheatfield was aware that its conduct could result in the deprivation of Individual Plaintiffs' fundamental due process rights to bodily integrity.

230. Defendant Town of Wheatfield deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs by creating and perpetuating the ongoing exposure to an unmaintained, unmonitored and unsecured hazardous waste site, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiffs.

231. Defendant Town of Wheatfield had the opportunity to reflect and deliberate before they acted and/or failed to act.

232. In exposing Plaintiffs to toxic contaminants and industrial solvents, including but not limited to Aldrin, Arsenic, Barium, BHC (Benzene Hexachloride), Benzo-trichlorides, Benzene, Caustics, Chlordane, Chlorobenzenes, Chromium, OC Pesticides, DDT, DDE, and DDD, Dieldrin, Dioxin, Endrin (Endrin Aldehyde), Hexachlorocyclohexane, Lindane (gamma-BHC), Lead, Mercury, Petroleum products (including hexane, benzene, toluene, xylenes, naphthalene, and fluorine), Plating tank sludge, Phenol, PAHs or Polycyclic aromatic

hydrocarbons, polychlorinated biphenyls  or PCBs and Love Canal wastes identified herein, Defendant Town of Wheatfield has violated Plaintiffs' right to bodily integrity. Defendants failed to protect the Plaintiffs from a foreseeable risk of harm from exposure to the contaminants.

233.    As a result of Defendant Town of Wheatfield's actions and/or omissions, Plaintiffs suffered bodily harm and their rights to bodily integrity were violated.

234.    Defendant Town of Wheatfield's actions and omissions were malicious, reckless, and/or were made with deliberate indifference to Plaintiffs' constitutional rights. Defendant Town of Wheatfield engaged in these acts willfully, maliciously, in bad faith, and/or in reckless disregard for Plaintiffs' constitutional rights.

235.    These actions shock the conscience of the Plaintiffs and of any reasonable person.

236.    As a result of the Defendant Town of Wheatfield's unlawful conduct, Plaintiffs have suffered injuries and seek relief.

237.    Defendant Town of Wheatfield's actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

238.    As a direct and proximate result of all of Defendant Town of Wheatfield's actions and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including (but not necessarily limited to): various health problems,  shortened life expectancy, miscarriage, physical pain and suffering, mental anguish, medical expenses, medical monitoring expenses, wage loss, brain and developmental injuries, cognitive deficits, lost earning capacity, aggravation and exacerbation of pre-existing conditions, and punitive damages.

**COUNT III – STATE LAW NEGLIGENCE**

**(Against Town of Wheatfield)**

239.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

240.    Negligence may exist both as an omission as well as an affirmative act.[21]  A cause sounding in negligence allows for the recovery for an injury that was proximately caused by another's violation of a duty of reasonable care.[22]

241.    Defendant the Town of Wheatfield, as owner and operator of the Site that accepted disposal of toxic contaminants and solvents, owed Plaintiffs a cognizable duty to exercise reasonable care in the disposal of toxic chemicals including but not limited to: Aldrin, Arsenic, Barium, BHC (Benzene Hexachloride), Benzo-trichlorides, Benzene, Caustics, Chlordane, Chlorobenzenes, Chromium, OC Pesticides, DDT, DDE, and DDD, Dieldrin, Dioxin, Endrin (Endrin Aldehyde), Hexachlorocyclohexane, Lindane (gamma- BHC), Lead, Mercury, Petroleum products (including hexane, benzene, toluene, xylenes, naphthalene, and fluorine), Plating tank sludge, Phenol, PAHs or Polycyclic aromatic hydrocarbons, polychlorinated biphenyls  or PCBs and Love Canal wastes identified herein.  Additionally, Defendant the Town of Wheatfield failed to exercise reasonable care when it knowingly permitted Love Canal waste to be disposed of in the Nash Road Landfill.

242.    Defendant Wheatfield breached its duty of reasonable care which a reasonably prudent person should use under the circumstances by negligently storing, disposing of, or otherwise causing the release into the ground toxic chemicals, including but not limited toAldrin, Arsenic, Barium, BHC (Benzene Hexachloride), Benzo-trichlorides, Benzene, Caustics, Chlordane, Chlorobenzenes, Chromium, OC Pesticides, DDT, DDE, and DDD, Dieldrin, Dioxin,

---

[21] See, e.g., *Zellar v. Tompkins Community Hospital*, 508 N.Y.S.2d 84 (3d Dep't 1986) (failure of hospital to adopt adequate staffing program stated a cause of action for negligence); *Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp.*, 379 N.Y.S.2d 873 (4th Dep't 1976) (event organizer's failure to provide adequate security and crowd control stated a cause of action for negligence).
[22] Am Jur. 2d, Negligence § 1

Endrin (Endrin Aldehyde), Hexachlorocyclohexane, Lindane (gamma- BHC), Lead, Mercury, Petroleum products (including hexane, benzene, toluene, xylenes, naphthalene, and fluorine), Plating tank sludge, Phenol, PAHs or Polycyclic aromatic hydrocarbons, polychlorinated biphenyls  or PCBs and Love Canal wastes identified herein, and negligently permitting their release into the soil and surface and groundwater in and around the Site and in the vicinity of Plaintiffs' real property.

243.    At all times mentioned herein, Defendant Wheatfield had knowledge and/or notice of the hazardous nature of the waste they dumped at the Nash Road Landfill.

244.    At all times mentioned herein, Defendant Wheatfield knew or should have known that the Nash Road Landfill was not a hazardous waste dump, and therefore not designed to contain hazardous waste.

245.    The release of the Contaminants into the soil and surface and groundwater water is the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their Property and the adjacent properties.

246.    To the extent that Defendant Wheatfield's actions resulted in the discharge and/or release of toxic contaminants into the soil and groundwater, thereby entering and injuring Plaintiff's physical and mental well-being, their real and personal property, and their economic interests, Defendant Wheatfield is liable for all damages from contamination in this case, their physical and mental well-being, their real and personal property, and their economic interests.

247.    Upon learning of the release of the contaminants, Defendant Wheatfield owed Plaintiffs and a duty to timely notify them that the aforementioned release from the Site had occurred.

248.    Defendant Wheatfield breached that duty by failing to timely notify the Plaintiffs of the release of the contaminants at the Site, and, consequently, in the vicinity of their Property.

249.     As a result of Defendant Wheatfield's breach of its duty to timely notify the Plaintiffs, the Plaintiffs were forestalled from undertaking effective and immediate remedial measures and Plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendant Wheatfield's negligence for many years into the future.

250.     Upon learning of the release of the contaminants, Defendant Wheatfield owed Plaintiffs and a duty to warn the Plaintiffs of the release of the contaminants and the dangers to the Plaintiffs, their Property, and neighboring properties that resulted therefrom.

251.     Defendant Wheatfield breached this duty by failing to adequately warn the Plaintiffs of the release of the contaminants and the potential dangers and harms that could result.

252.     As a result of Defendant Wheatfield's breach of its duty to warn the Plaintiffs of the release of the contaminants and the potential dangers and harms that could result, the Defendant Wheatfield's actions and omissions are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their Property and the adjacent properties.

253.     Defendant Wheatfield further had a duty to the Plaintiffs upon learning of the release of the contaminants to act reasonably to remediate, contain, and eliminate the spill before it injured Plaintiffs and their property and/or to act reasonably to minimize the damage to Plaintiffs' property.

254.     Defendant Wheatfield breached that duty by failing to act reasonably to remediate, contain, the eliminate contaminants before they injured Plaintiffs and their property and/or to act reasonably to minimize the damage to Plaintiffs' property.

255.     As a result of Defendant Wheatfield's breach of its duty to Plaintiffs by failing to act reasonably to remediate, contain, and eliminate the contaminants, the Defendants' actions and

omissions are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their Property and the adjacent properties.

256.    Defendant Wheatfield had a duty to the Plaintiffs to ensure that the Contaminants at the Wheatfield site were sufficiently secure as to prevent the release of the contaminants into the environment surrounding their facilities and into the Plaintiffs' Property and neighboring properties.

257.    Defendant Wheatfield negligently breached its duty to the Plaintiffs to ensure that their refining and storage facilities were safe and sufficiently secure as to prevent the release of the contaminants into the environment surrounding their facilities and, consequently, as a result of this breach, contaminants entered into Plaintiffs' Property.

258.    As a result of Defendant Wheatfield's breach of its duty to Plaintiffs by failing to ensure that the Site was safe and sufficiently secure as to prevent the release of the contaminants into the environment surrounding the Site, they are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their Property and the adjacent properties.

259.    Defendant Wheatfield had a legal duty to properly remediate the contamination from their activities at the Site and had full knowledge of the extent of the contamination and the threat it poses to human health and safety.

260.    Defendant Wheatfield willfully and wantonly breached its legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

261.    As a result of Defendant Wheatfield's breach of its legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses

to human health and safety, they are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their Property and the adjacent properties.

262.    Each and every one of these Plaintiffs suffered foreseeable injuries and damages as a proximate result of said Defendant Wheatfield's negligent breach of their duties as set forth above. At the time Defendant Wheatfield breached its duties to Plaintiffs, Defendant Wheatfield's acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs so apparent as to entitle Plaintiffs and to be protected against such actions or inactions.

263.    Accordingly, Plaintiffs seek damages from Defendant Wheatfield, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs to their original position, including, but not limited to, injuries to persons, consequential damages for medical monitoring, the difference between the current value of their Property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential damages flowing from the trespass which are the natural and proximate result of Defendant Wheatfield's conduct in an amount to be proved at trial. Upon information and belief such amount exceeds the jurisdictional amount of the lower courts.

## COUNT IV – STATE LAW STRICT LIABILITY

### (Against all Defendants)

264.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

265.    Activities such as the disposal of hazardous chemical wastes as is the case herein constitutes an abnormally dangerous activity for which strict liability will apply.

266.     Defendants failed to ensure that their hazardous and toxic wastes were stored and/or disposed of in a manner which would not injure Plaintiffs.

267.     Defendants' aforesaid failure to employ reasonable care which a reasonably prudent person should use under the circumstances by storing, disposing of, or otherwise releasing into the ground dangerous contaminations, including but not limited toAldrin, Arsenic, Barium, BHC (Benzene Hexachloride), Benzo-trichlorides, Benzene, Caustics, Chlordane, Chlorobenzenes, Chromium, OC Pesticides, DDT, DDE, and DDD, Dieldrin, Dioxin, Endrin (Endrin Aldehyde), Hexachlorocyclohexane, Lindane (gamma- BHC), Lead, Mercury, Petroleum products (including hexane, benzene, toluene, xylenes, naphthalene, and fluorine), Plating tank sludge, Phenol, PAHs or Polycyclic aromatic hydrocarbons, polychlorinated biphenyls  or PCBs and Love Canal wastes identified herein, constitutes ultra-hazardous and abnormally dangerous activities involving ultra-hazardous, abnormally dangerous substances.

268.     Defendants allowed or caused these ultra-hazardous and abnormally dangerous substances to leak into the surrounding land and surface water, and in doing so, failed to warn Plaintiffs of the dangerous condition that was caused thereby.

269.     The risks posed by such activities outweigh any value associated with the same.  As the result of said ultra-hazardous and abnormally dangerous activities, Plaintiffs have suffered damages and imminent, substantial and impending harm to their health, family, and home value. Plaintiffs have expended or will be forced to expend significant resources to safeguard their health and property, obtaining monitoring, testing, remediation services or equipment, as well as health monitoring, indefinitely for years and decades into the future.

270.     By reason of the foregoing, Defendants are strictly liable in tort for the damages sustained by Plaintiffs.

271.     Accordingly, Plaintiffs seek damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs to their original position, including, but not limited to injuries to persons, consequential damages for medical monitoring, the difference between the current value of their Property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.  Upon information and belief such amount exceeds the jurisdictional amount of the lower courts.

## COUNT V – STATE LAW TRESPASS

### (Against Town of Wheatfield )

272.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

273.     Environmental contamination of a property constitutes a trespass as it interferes with the conditions of the property.[23] This act of trespass is, in and of itself, objectionable.[24]

274.     Upon information and belief, Defendant Wheatfield had knowledge of the hazardous nature of their waste and the ability to excavate and remove it from the Site to a proper hazardous waste facility at all relevant times.

275.     Upon information and belief Defendant Wheatfield's negligent, willful, and/or wanton actions and/or intentional failures to act caused an uncontrolled quantity of Contaminants

---

[23] See *State v. Fermenta ASC Corp.*, 630 N.Y.S.2d 884 (Sup 1995), aff'd in part, 656 N.Y.S.2d 342 (2d Dep't 1997).
[24] See *PBN Associates v. Xerox Corp.*, 517 N.Y.S.2d 1015 (Sup 1987), *judgment modified*, 529 N.Y.S.2d 877 (2d Dep't 1988) *and decision modified on reargument on other grounds*, 575 N.Y.S.2d 451 (2d Dep't 1991).

to be spilled, disposed of, or otherwise released into the ground, soil, groundwater, and aquifer at the Site.

276.    Defendant Wheatfield knew or should have known that the disposal and/or storage of hazardous wastes in an unlined landfill adjacent to a residential community with no engineering controls to prevent migration would lead to migration of these wastes from the Landfill to Plaintiff Property causing trespass to Plaintiffs' Property.

277.    Leaching and/or migration of Defendants' toxic and hazardous wastes was foreseeable because the landfill was unlined and had wetland (swampy)and frequent flooding conditions.

278.    As described herein, there were numerous warnings from the Niagara County Department of Health and New York State Department of Health about open dumping, drums of liquid waste, lack of adequate cover, and no appropriate drainage that indicated that the migration of wastes was likely.

279.    The materials disposed of by or for Defendant Wheatfield at the Landfill have created a mixture of toxic and hazardous chemicals which began continuously seeping out of and migrating from the unlined Landfill since the various wastes were deposited. Since the closure of the Landfill and final disposal by or for Defendants, the various contaminants have migrated together as a toxic stew in groundwater and surface water.

280.    Defendant Wheatfield knew of the conditions at the Landfill making the migration of toxic and hazardous waste disposed of there by groundwater, surface water, and air dispersion likely to occur and reach the Property of Plaintiffs and the community adjacent to the Landfill.

281.    Despite having all information necessary to know that migration was likely to occur, Wheatfield abandoned the Landfill without any controls or remediation to prevent or stop

migration of the hazardous waste at the Landfill to Plaintiffs' property via groundwater, surface water, and air dispersion.

282.   Testing at the Landfill on multiple occasions by the NYSDEC confirms that environmental contaminants from Defendants' disposal operations and/or waste contaminated the Landfill surface soil, subsurface soil, surface water, and groundwater. This testing included sample results that, according to both the NYSDEC and Glenn Springs Holdings, Inc. (an affiliate of the Occidental Chemical Corporation), appeared to be consistent with chemicals found in industrial waste present in the Love Canal landfill.

283.   In 2014, the NYSDEC conducted a supplemental site assessment at the Landfill and sample locations with: hazardous concentrations of lead; exceedance of the commercial soil cleanup standards for PCBs; exceedances of the residential soil cleanup standards for PAHs in surface soil; groundwater with elevated concentrations of Volatile Organic Compounds (VOCs), Semi-Volatile Organic Compounds (SVOCs), pesticides, and metals that exceeded Technical and Operational Guidance Series Ambient Water Quality Standards and Guidance Values for Class GA Groundwater.

284.   Upon information and belief, the contaminants disposed of, or otherwise released into the ground, soil, groundwater, and aquifer at the Site entered and trespassed upon the land and realty of the Plaintiffs, thus interfering with the condition of Plaintiffs' Property and the neighboring  properties, causing an injury to their possession and/or right of possession.

285.   Testing at properties within the community demonstrate that the same chemicals/contaminants present at the Landfill and/or expected to have been present at the Landfill have migrated to Plaintiffs' Property. The contamination was transported primarily through groundwater and entered Plaintiffs' homes through groundwater seepage and soil vapor intrusion.

286.     Upon information and belief, Defendant Wheatfield took affirmative, voluntary, and intentional actions to dispose of the contaminants into the ground at an unlined municipal landfill.

287.     Upon information and belief, at the time that the above described affirmative, voluntary, and intentional acts were performed, Defendant Wheatfield had good reason to know or expect that the large quantities of Contaminants would pass through the soil, groundwater, and aquifer from the Site to the land of Plaintiffs' and the neighboring properties.

288.     Upon information and belief, the above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause the Contaminants to be disbursed through the soil, groundwater, and aquifer without regard for the inevitable transport onto the land and property of Plaintiffs' and the neighboring properties.

289.     Defendant Wheatfield's actions in disposing of uncontrolled amounts of the Contaminants into the ground were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

290.     Upon information and belief, Plaintiffs' Property was and continue to be infiltrated by toxic components of the wastes disposed of, by, or for Defendant Wheatfield through groundwater seepage, soil vapor intrusion, and surface water runoff from the Landfill which trespassed and continues to trespass on Plaintiff's property and an interference with the right to possess and enjoy Plaintiff's real property. Intrusion of Defendants' toxic and hazardous waste into homes has caused significant health problems, noxious odors, and other issues related to the possession and enjoyment of their Property.

291.     These voluntary and intentional actions resulted in the trespass of the Contaminants, which is continuing and ongoing on to the Plaintiffs' and neighboring properties,

thus interfering with the condition of Plaintiffs' Property, causing injury and damage to Plaintiffs, their property and their right of possession of their property.

292.   Based upon the above, Plaintiffs seek general damages from Defendant Wheatfield, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained by Plaintiffs and to restore Plaintiffs to their original position, including, but not limited to, injuries to persons, consequential damages for medical monitoring, the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, consequential damages flowing from the trespass which are the natural and proximate result of Defendant Wheatfield's conduct, and exemplary or punitive damages.

## DAMAGES

293.   Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

294.   Plaintiffs,  have been and continue to be exposed to elevated and hazardous levels of toxic and hazardous substances, including but not limited to: Aldrin, Arsenic, Barium, BHC (Benzene Hexachloride), Benzo-trichlorides, Benzene, Caustics, Chlordane, Chlorobenzenes, Chromium, OC Pesticides, DDT, DDE, and DDD, Dieldrin, Dioxin, Endrin (Endrin Aldehyde), Hexachlorocyclohexane, Lindane (gamma- BHC), Lead, Mercury, Petroleum products (including hexane, benzene, toluene, xylenes, naphthalene, and fluorine), Plating tank sludge, Phenol, PAHs or Polycyclic aromatic hydrocarbons, polychlorinated biphenyls  or PCBs and Love Canal wastes identified herein.

295.   Plaintiffs were and continue to be exposed to the elevated and hazardous level of toxic and hazardous substances through dermal contact with contaminated soil, ingestion and

dermal contact with fruits and vegetables and other items grown or developed in the contaminated soil, the ingestion and/or inhalation of toxic matter, and the continued physical contact with contaminated soil, vapors, and debris.

296.    Plaintiffs have sustained and will continue to sustain damages to their Property as a result of Defendants' actions. As a result, Plaintiffs seek monetary damages for each violation of the Counts I - V.  In particular, Plaintiffs seek (i) monetary damages for personal injuries; (ii) monetary damages reflecting the cost to remediate Plaintiffs' property of the contamination caused by Defendants' conduct or, in the alternative, to compensate Plaintiffs' for the diminution in value of their property caused by Defendants' conduct; (iii) and monetary damages to compensate Plaintiffs' for the loss of the use and enjoyment of their Property caused by Defendant's conduct.

297.    Plaintiffs also seek consequential damages sufficient to fund a medical monitoring program[25] that is reasonably tailored to the exposure risks of the contaminants emanating from Defendants' property, including but not limited to: Aldrin, Arsenic, Barium, BHC (Benzene Hexachloride), Benzo-trichlorides, Benzene, Caustics, Chlordane, Chlorobenzenes, Chromium, OC Pesticides, DDT, DDE, and DDD, Dieldrin, Dioxin, Endrin (Endrin Aldehyde), Hexachlorocyclohexane, Lindane (gamma- BHC), Lead, Mercury, Petroleum products (including hexane, benzene, toluene, xylenes, naphthalene, and fluorine), Plating tank sludge, Phenol, PAHs or Polycyclic aromatic hydrocarbons, polychlorinated biphenyls  or PCBs and Love Canal wastes identified herein.

298.    As cancer risk from multiple agents is additive, the cumulative cancer risk posed by multiple contaminants is consequently greater that the risk posed by any single contaminant.

---

[25] Medical Monitoring is not being sought as in independent cause of action but, rather, as consequential damages in connection with the personal injury and property claims sought herein as is appropriate. *See Ivory v. Int'l Bus. Mach. Corp.,* 983 N.Y.S.2d 110 (2014), *leave to appeal denied,* 11 N.E.3d 204 (2014).

299.    Defendants continued negligent acts and omissions in operating and maintain the Site are the proximate cause of higher than normal, in fact excessive exposure, to hazardous substances and contaminants, including but not limited to Aldrin, Arsenic, Barium, BHC (Benzene Hexachloride), Benzo-trichlorides, Benzene, Caustics, Chlordane, Chlorobenzenes, Chromium, OC Pesticides, DDT, DDE, and DDD, Dieldrin, Dioxin, Endrin (Endrin Aldehyde), Hexachlorocyclohexane, Lindane (gamma- BHC), Lead, Mercury, Petroleum products (including hexane, benzene, toluene, xylenes, naphthalene, and fluorine), Plating tank sludge, Phenol, PAHs or Polycyclic aromatic hydrocarbons, polychlorinated biphenyls  or PCBs and Love Canal wastes identified herein.

300.    The resulting exposure has significantly increased the risk of Plaintiffs of contracting serious latent diseases, including but not limited to reproductive, endocrine, lung, skin, breast, bladder, liver, kidney, prostate cancer, and other cancers, permanent intellectual and behavioral effects on child development, effects on the central nervous system, musculoskeletal, immune, digestive, endocrine, cardiac, digestive, respiratory, and other diseases and conditions.

301.    Each and every one of these Plaintiffs will incur future expenses for medical monitoring and, as a result, seek payment of their related medical expenses as an element of the consequential damages.

302.    In order to compensate Plaintiffs for damages suffered due to Defendants' acts, each and every Plaintiff requires, among other things, that Defendants collectively pay the future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary in order to ascertain and treat the nature and extent of the injuries suffered due to the contamination that emanated and continues to emanate from the Site.  Many of these costs would not be covered by health care insurers, and if covered, may unfairly result in increased premiums.

303.    Each and every one of these Plaintiffs are at a significantly elevated risk resulting from their exposure to hazardous substances and chemicals in and around their homes in the North Tonawanda and Wheatfield area can only be mitigated and/or addressed by the creation of a medical monitoring program (the "Program") including but not limited to:

      a.    Establishing a program that provides education and outreach on the existence and availability of the services established under the medical monitoring program, including but not limited to the establishment of a public Website with information about the  Program, meetings with potentially eligible populations, development and dissemination of outreach materials informing North Tonawanda and Wheatfield residents about the program, and the establishment of phone information services;

      b.    Funding medical monitoring for those individuals exposed to the contaminants described of herein, including but not limited to Aldrin, Arsenic, Barium, BHC (Benzene Hexachloride), Benzo-trichlorides, Benzene, Caustics, Chlordane, Chlorobenzenes, Chromium, OC Pesticides, DDT, DDE, and DDD, Dieldrin, Dioxin, Endrin (Endrin Aldehyde), Hexachlorocyclohexane, Lindane (gamma- BHC), Lead, Mercury, Petroleum products (including hexane, benzene, toluene, xylenes, naphthalene, and fluorine), Plating tank sludge, Phenol, PAHs or Polycyclic aromatic hydrocarbons, polychlorinated biphenyls  or PCBs and Love Canal wastes identified herein;

      c.    Funding research into possible cures for the detrimental effects of breathing, living and working near the contaminants and toxicants present in the North Tonawanda and Wheatfield area as a result of the acts and omissions alleged here;

      d.      Gathering and forwarding to each and every one of these Plaintiffs' treating physicians' information related to the diagnosis and treatment of injuries which result from their exposure(s) in and around  North Tonawanda and Wheatfield;

      e.      Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of each and every one of these Plaintiffs.

      f.      Funding further studies of the long-term effects of the exposure.

304.    Prescribed monitoring procedures exist that makes the early detection of these diseases possible.

305.    The monitoring procedures or regimes are different from normally recommended procedures that would be used in the absence of the exposure.

306.    The prescribed medical monitoring is reasonably necessary according to contemporary scientific principals for persons such as Plaintiffs who have been exposed and continue to be exposed to excessive levels of the referenced hazardous chemicals and materials.

307.    Plaintiffs will suffer irreparable harm if the requested medical monitoring program is not implemented because they are in danger of suffering catastrophic latent diseases as a result of their prolonged exposure to toxic and hazardous substance caused by Defendants' negligence.

308.    Detection of these diseases and early treatment is medically reasonable and necessary to prevent progression and further injuries.

309.    It is also medically reasonable and necessary to collect data and coordinate study efforts for persons exposed to such substances in order to effectively treat Plaintiffs.

310.    Establishment of a medical monitoring program for the Plaintiffs is essential as a consequential damage from their exposure to the contaminants because without the requested medical monitoring programs, they will be subjected to further injuries and delayed treatment.

311.    Plaintiffs request that the Court appoint a plan administrator, require the Defendants to fund the medical monitoring plan, and reserve jurisdiction to enforce the terms and conditions of the plan.

312.    Accordingly, Plaintiffs are entitled to a medical monitoring program which provides for medical testing, surveillance, monitoring, and study of the Plaintiffs for conditions caused by exposure to the references substances, as well as payment of their attorney's fees and expenses, and any other relief this court deems just and proper.

## PUNITIVE DAMAGES

313.    Plaintiffs are entitled to punitive damages from Defendants because the non-municipal Defendants failed to warn past and present purchasers of a serious danger of which Defendants as chemical manufacturers or transporters had received growing confirmation over the years.

314.    The 1988, 1989, and 2013-2014, and 2016 reports, combined with Defendants' superior and growing knowledge of the harms associated with exposure to this waste by the public, should have triggered an immediate response from the non-municipal Defendants, including a warning to Plaintiffs and other residents. The Non-municipal Defendants were well aware -- even during the disposal period -- that the wastes from Lindane production and several other chemical processes were highly toxic.

315.    Defendants failed to warn Plaintiffs or the community about the hazards of exposure to the chemical wastes at the Site.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request the Court to enter judgment against Defendants as follows:

A. As for the 42 U.S.C. §1983 Causes of action, Plaintiffs seek general damages from Defendant Wheatfield, in an amount to be determined at trial, an award of reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988, general and exemplary damages sufficient to deter and to make an example of the Town, because their actions were callously indifferent to federally protected rights, or were wantonly or oppressively done, and any other statute or law as may be applicable.

B. As and for the Cause of Action sounding in negligence, Plaintiffs seek general damages from Defendant Wheatfield in an amount to be determined at trial, directly resulting from their personal  injuries and property damages in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants' conduct in an amount in excess of the jurisdictional minimum, as well as punitive damages, exclusive of interest, costs, and attorneys' fees.

C. As and for the Cause of Action sounding in strict liability, Plaintiffs seek general damages from all Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and

consequential damages flowing from the trespass which are the natural and proximate result of Defendants' conduct in an amount in excess of the jurisdictional minimum, as well as punitive damages, exclusive of interest, costs, and attorneys' fees.

D.  As and for the Cause of Action sounding in trespass, Plaintiffs seek general damages from Defendant Wheatfield, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained, and to restore Plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and the direct and consequential damages flowing from the trespass and resulting condition which are the natural and proximate result of Defendants conduct in an amount in excess of the jurisdictional minimum as well as punitive damages, exclusive of interest, costs, and attorneys fees.

E.  As and for the combined claims on each of the foregoing causes of action, all of which flow directly as a result of the wanton, willful and reckless conduct of the Defendants and each of the Defendants herein, Plaintiffs seek exemplary or punitive damages in addition to the compensatory damages set forth, *supra*, in an amount to be determined at trial.

F.  An Order mandating that the Defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

G.  To the extent Plaintiffs prevail on their Constitutional claims, an award of the costs of this lawsuit, including but not limited to attorneys' fees and expert costs.

H.  Awarding Plaintiffs such other, further, and different relief as the Court may deem appropriate and just.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims asserted in this Complaint.

Dated: East Amherst, NY
February 24, 2023                                  Respectfully submitted,

**STAG LIUZZA L.L.C.**                    BY: */s/ Christen Civiletto*
Michael Stag *(pending Pro Hac Vice)*        **CHRISTEN CIVILETTO**
Ashley Liuzza *(pending Pro Hac Vice)*        Christen Civiletto, Esq.
One Canal Place                               8313 West Point Drive
365 Canal Street, Suite 2850                  East Amherst, N.Y. 14051
New Orleans, Louisiana 70130                  (716) 713-2431
Tel:(504) 593-9600                            Christenciviletto@gmail.com
Fax: (504) 593-9601
mstag@stagliuzza.com
aliuzza@stagliuzza.com
                                              **NAPOLI SHKOLNIK PLLC**
                                              Paul J. Napoli
                                              1302 Avenue Ponce de León
                                              San Juan, PR 00907
                                              Tel: (212) 397-1000
                                              Fax: (646) 843-7603
                                              pnapoli@napolilaw.com

                                              Nevin Wisnoski *(pending Pro Hac Vice)*
                                              123 Culbreth Drive, Suite 216
                                              Wilmington, NC 28405
                                              Tel: (212) 397-1000
                                              Fax: (646) 843-7603
                                              NWisnoski@NapoliLaw.com

*Attorneys for Plaintiffs*